PEOPLE v LYNCH

1. HOMICIDE—FIRST-DEGREE MURDER—STARVATION—INTENT.

The intent in a case of first-degree murder by starvation must be of a dual nature to be culpable: (1) it must entail a specific will to withhold the performance of a duty which the accused is under a legal duty to perform, and (2) there must be a specific will to accomplish a particular result, death of the person to whom is owed the duty (MCLA 750.316).

2. HOMICIDE—INTENT—INFERENCES—QUESTION OF FACT.

Intent to kill may be implied or inferred from the surrounding circumstances, or the nature of the act causing death, but it is a conclusion to be drawn or an inference to be made as one of fact by the trier of fact.

3. HOMICIDE—INTENT—EVIDENCE—ADMISSIBILITY.

An act causing death is not conclusive evidence of intent to cause the result and does not foreclose any other proof relevant to such intent; any other evidence having possible probative value thereon ought to be admissible.

4. HOMICIDE—FIRST-DEGREE    MURDER—PREMEDITATION—DELIBERA-TION.

Premeditation and deliberation must be affirmatively shown in a prosecution for first-degree murder, and cannot be established by those ordinary legal inferences which were sufficient at the common law to establish the general crime, but at which the statutes, by dividing the crime into degrees, especially aimed (MCLA 750.316, 750.317).

5. HOMICIDE—FIRST-DEGREE    MURDER—INTENT—EVIDENCE—ADMISSI-BILITY.

Testimony of two doctors regarding the mental condition of the defendant in a first-degree murder trial was admissible as bearing on defendant's intent even though insanity was not claimed as a defense since the state of mind of the accused by

REFERENCES FOR POINTS IN HEADNOTES
[1–5] 40 Am Jur 2d, Homicide §§ 45, 46, 48.
[3] 29 Am Jur 2d, Evidence § 324.

> definition determines the degree of the offense and the testimony was both relevant and material to defendant's state of mind; there appears to be no good reason in law or public policy for excluding the testimony (MCLA 750.316).

Appeal from Midland, James R. Rood, J. Submitted Division 2 February 14, 1973, at Lansing. (Docket No. 13630.) Decided May 10, 1973. Leave to appeal denied, 390 Mich 777.

Margaret Ann Lynch was convicted of first-degree murder. Defendant appeals. Reversed, and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Edward G. Durance,* Prosecuting Attorney, and *Robert G. Fraser,* Chief Assistant Prosecuting Attorney, for the people.

*Tyrone Gillespie,* for defendant.

Before: McGREGOR, P. J., and QUINN and PETERSON,* JJ.

PETERSON, J. Defendant was charged with first-degree murder, MCLA 750.316; MSA 28.548, was convicted by a jury, and appeals. She was charged with having murdered her newborn daughter by starvation.

The child was born February 4, 1971, and weighed seven pounds two ounces at birth. She was an apparently normal child except that she had a cleft palate and harelip. Because of this, the child was kept at the hospital two extra days. Although the condition did make feeding difficult, she did seem to feed reasonably well and was in good health on being released to the mother on February 8th. On that date, the child weighed 6 pounds 13 ounces. On February 16th, defendant

---

* Circuit judge, sitting on the Court of Appeals by assignment.

took the child to the Family Health Service and it weighed approximately the same. At that time a March 8th appointment was made for surgery for repair of the cleft palate and harelip. On March 4, 1971, the child was found dead. An autopsy the following day fixed the weight of the remains as four pounds six ounces and established the cause of death as extreme primary malnutrition, *i.e.,* starvation. No condition preventing normal assimilation of food existed. While defendant and others testified as to feeding of the child during the last few days of its life, the testimony of the prosecution's medical experts was that the child had had no food for at least three days prior to death. There was no food residue in the stomach or small intestine.

On March 12th, defendant was taken to the sheriff's office and interrogated, and gave a statement which was not offered in evidence. On at least two occasions she was questioned by the county medical examiner. On March 24, an inquest was held before the district judge, at which defendant was summoned and examined. The jury finding was that the child's death resulted from non-criminal neglect by its father and from willful neglect by defendant. At the completion of the inquest, defendant was promptly arrested and arraigned before the district judge on a charge of first-degree murder. The following day she was again interrogated and a confession was elicited to the effect that she had deliberately withheld feeding from her baby. At no point had she been represented by or had the advice of counsel.[1]

On its face, the confession, if not equivocal, suggests serious question as to the state of mind of

---

[1] The trial court found the confession admissible after a *Walker* hearing. The hearing record sustains his determination.

the defendant. It is clearly the work of a skilled interrogator, with a dull and suggestible defendant supplying appropriate responses to leading questions. It begins by defendant saying that she was "under pressure to do what my mother had said", and then recounts a melancholy host of pressures on the defendant from a termagant adoptive mother to whom defendant believed the malformed child was a curse, an unfeeling husband who disavowed his parentage of the child, gossip of neighbors, and the strain of caring for the child. The incriminating portion of the confession then follows:

"*Q.* Did there come a time in which you thought Lisa Marie would be better off dead than alive because of the harelip and cleft palate?

"*A.* Well, yes, there was.

"*Q.* Did it enter your mind on how you could accomplish this?

"*A.* Yes, I think so.

"*Q.* When was this, during the first, second or third week after you got home from the hospital?

"*A.* The second week.

"*Q.* How did you consider doing this?

"*A.* Gradually taking her bottle away from her.

"*Q.* Margaret, why did you think that this would be a good way to accomplish this?

"*A.* I just figured she would be better off.

"*Q.* When did you first start keeping the bottle from her?

"*A.* During the third week.

"*Q.* How would you prevent her from getting her milk? By that, I mean, would you just not give her any milk or would you give her smaller amounts?

"*A.* Smaller amounts.

"*Q.* How often would you do this?

"*A.* Twice a day.

"*Q.* Did there come a time when you realized that Lisa Marie could not survive much longer?

"*A.* Yes, about two or three days before she died.

"*Q.* What made you realize this?

"*A.* Not her size so much; I think it was her movements.

"*Q.* What was her movements that indicated to you that the baby could not survive much longer?

"*A.* She wasn't active. That was about all.

"*Q.* Margaret, I have been told that some people had told you that the baby should have been taken to the doctor just before she died, is that correct?

"*A.* Yes.

"*Q.* Who told you this?

"*A.* My mother and Cathy Cepak.

"*Q.* Why didn't you take her to the doctor?

"*A.* Because I didn't think anything was wrong with her.

"*Q.* After realizing her movements had changed and you still didn't realize anything was wrong, is that true?

"*A.* Yes.

"*Q.* What explanation have you got for that?

"*A.* I just thought that she was going to be a slow baby."

After going into further details about the husband's absences from the home and the rejection of the child by defendant's adoptive mother, the confession concluded:

"*Q.* Because of the above factors, is this the strongest reasons why you discontinued caring and feeding Lisa Marie?

"*A.* I think so.

"*Q.* Are there any other reasons?

"*A.* None that I know of. I was upset all the time.

"*Q.* On March 4, 1971, after Lisa had died, did you think she was better off dead than alive?

"*A.* Yes.

"*Q.* Why did you think this?

"*A.* Because she would have been tormented all her life.

"*Q.* How would she have been tormented?

"*A.* Because everybody would have been talking about her.

"*Q.* What would they have been saying about her?

"*A.* That she had a harelip when she was born.

"*Q.* Had you been told that the defect that Lisa had was a very minor one?

"*A.* Yes.

"*Q.* By whom and when?

"*A.* Dr. Willis told me before I left the hospital.

"*Q.* Margaret, do you still believe that Lisa Marie is better off dead?

"*A.* Yes."

The defendant was then 23 years of age and already the mother of two other children. She was not aware of the identity of her mother but believed her to be a mentally ill person. At six months of age she was adopted by her father and his wife. They in turn were divorced when defendant was two years old and the adoptive mother, with whom defendant remained, then remarried. Defendant's childhood and home environment were unhappy and she eventually went to live with others while in high school. She dropped out of school to marry and was divorced six months later. She then married her present husband who appears to be of little help, considerable hindrance, and dubious faithfulness, regularly absenting himself from the home overnight. His employment was irregular. At the time of the child's birth, he was summoned from a tavern to accompany defendant to the hospital.

The jury did not hear about most of this history nor was it told that psychiatric examination of defendant indicated a history of unfortunate childhood experiences, an insecure marriage, a dull

normal intelligence, a feeling of chronic rejection, suggestibility, a marked impairment of ability to understand or comprehend and appraise the immediate or future consequences of her actions, and that all of these deficiencies would increase under stress. The questions of merit on appeal deal with the exclusion of such psychiatric testimony and other testimony bearing on the state of mind of defendant, which testimony was offered by the defense not to show insanity but as a bearing on the elements of premeditation and intent.

The prosecution called as its witness Dr. Richard F. Willis, who delivered the child and who testified as to its condition at birth, instructions given defendant, and its condition at death. During cross-examination it developed that Dr. Willis had seen defendant for a post-partum examination on March 15, 1971, 11 days after the death of the child. During the course of the examination, the conversation turned to the death of the child and to defendant's mental condition and state of mind. The matter was sufficiently important in the doctor's mind that he took extensive notes and dictated a summary which was transcribed as part of the hospital record.[2] Opposing defendant's contention that the conversation was admissible as bearing on defendant's intent, and that her state of mind was material to the question of the truthfulness of her confession, the prosecutor objected that it was premature as (1) refuting a confession not yet offered in evidence, and (2) self-serving hearsay uttered by a defendant who might not take the witness stand to be cross-examined,[3] and that it

---

[2] To objections that the doctor's testimony was not the best evidence, the hospital record was marked as Exhibit C. Although the best evidence objection is not an appropriate one, it was then agreed that the exhibit would serve in lieu of the doctor's testimony on separate record.

[3] Defendant did thereafter testify in her own defense.

was irrelevant since defendant was not claiming insanity. The offer troubled the trial judge who ruled that the testimony " \* \* \* is not admissible at this time. It may become material later." It was not later received and on motion for new trial, the judge said:

"Defendant contends that the evidence is material on the question of intent. The defendant did not raise the defense of insanity in this case; not only was no pre-trial notice given, but defendant made it clear that no such defense was intended. Had such a defense been interposed in this case, Exhibit C would have been material on the question of responsibility of the defendant for her acts."

As part of the defense, Dr. Arthur Basel, a psychiatrist, was offered as a witness. The proffered testimony would have detailed his examinations and interviews with defendant and conclusions about her mentality and state of mind as bearing upon her intent in dealing with her baby and the truthfulness of her confession.[4] The doctor's conclusions, briefly, were that defendant did not intend her baby's death, conceivably did not comprehend that the baby was starving to death, did not have the psychological traits, qualities, and structure requisite to murder, and that her confession was not credible. The trial court was again troubled by the offer of proof, ultimately concluding that since no insanity defense notice had been given, the testimony was barred.[5]

---

[4] Although defendant's counsel did not make the latter point in his offer of proof, it is clear that he so intended, that the point was argued to the court earlier in connection with the attempt to question Dr. Willis about his examination of defendant, and it was argued on the motion for new trial.

As to the admissibility of such testimony as bearing on the credibility of a confession, *see State v Deyo,* 387 SW2d 561 (Mo, 1965).

[5] We note that the insanity notice statute, MCLA 768.20; MSA 28.1043, does not bar such evidence ipso facto on failure to give such

To paraphrase Thayer's famous principle:[6] Is there a good reason for admitting testimony of this nature? Or, is there any good reason for excluding it? The former question involves tests of materiality and relevance. That the offered testimony was material cannot be doubted in view of the definition of murder as an intentional killing, and the statutory definition of first-degree murder as that murder which is willful, deliberate, and premeditated. Nor can it be doubted that such evidence is relevant, that is, of some probative value, to the material element of intent. Such an intent in a case of a nature such as this must be of a dual nature to be culpable, *i.e.,* (1) it must entail a specific will to withhold the performance of a duty which the accused is under a legal duty to perform, and (2) there must be a specific will to accomplish a particular result, death of the person to whom is owed the duty.[7]

---

notice but leaves it as a matter of discretion with the trial judge. We also note that the trial judge felt that he could not adjourn for a few days to permit the prosecution to have time to meet the offered expert testimony. While there may have been reasons relating to the court's schedule at the time, we know of no rule forbidding an in-trial recess of such nature.

[6] Thayer, Preliminary Treatise on Evidence, pp 264–265 (1898):

"There is a principle—not so much a rule of evidence as a presupposition involved in the very conception of a rational system of evidence, as contrasted with the old formal and mechanical systems—which forbids receiving anything irrelevant, not logically probative.

\* \* \*

"There is another precept which should be laid down as preliminary, in stating the law of evidence; namely, that unless excluded by some rule or principle of law, all that is logically probative is admissible."

[7] Only three starvation cases are found, *Lewis v State,* 72 GA 164; 53 Am Rep 835 (1883); *Commonwealth v Hall,* 322 Mass 523; 78 NE2d 644 (1948); *Biddle v Commonwealth,* 206 Va 14; 141 SE2d 710 (1965). The more common prosecution for failure to perform a legal duty involves medical care. *See State v Noakes,* 70 Vt 247; 40 A 249 (1897). *Cf.* 100 ALR2d 488; *People v Beardsley,* 150 Mich 206 (1907). The cases seem to require these proofs for culpable homicide from omission to perform a legal duty: (1) the legal duty; (2) the capacity, means

It is argued that murder is a general intent, rather than a specific intent crime, and that, therefore, such evidence is irrelevant and immaterial. To so hold, however, would be to make the question of intent one of law rather than of fact.[8] While intent to kill may be implied or inferred from the surrounding circumstances, or the nature of the act causing death,[9] this is a conclusion to be drawn or an inference to be made as one of fact by the trier of fact.[10] To permit such an inference is far short of requiring it. We know of no authority which makes the act causing death conclusive

and ability to perform the duty; (3) a willful neglect or refusal to perform the duty; and (4) death as a direct and immediate consequence of the failure to act.

The cases are largely manslaughter prosecutions and none satisfactorily discuss the circumstances which would distinguish the categories of culpable homicide. Although many of the manslaughter cases involved death resulting from willful neglect or refusal to perform a legal duty, it would seem that that of a nature such as here charged would be more appropriately classified as murder. *See Pallis v State,* 123 Ala 12; 26 So 339 (1898) (abondonment of a child in a remote place). *See also* 40 Am Jur 2d, Homicide, § 89, pp 382–383; *Criminal Omissions,* 67 Yale LJ 590 (1958).

[8] See I Wigmore on Evidence (3d ed), § 2, pp 5–9.

[9] E.g., *Wellar v People,* 30 Mich 16 (1874); *People v Wolf,* 95 Mich 625 (1893); *People v Podolski,* 332 Mich 508 (1952); 2 Wigmore on Evidence (3d ed), § 242, pp 38–40.

[10] We think, moreover, that the categorization of all murder, and particularly first-degree murder, as a general intent offense is inaccurate. The proposition originates with *People v Garbutt,* 17 Mich 9 (1868), and *Roberts v People,* 19 Mich 401 (1870). *Garbutt* involved the court's first encounter with the intoxication defense and rejected it out-of-hand in what was essentially a public policy declaration, p 19. Significantly, in turning to the question of insanity as a defense, p 21, the Court rejected the argument that the burden of proof of insanity was on the accused, and found that the presumption of innocence mandated that the burden of proof of mental capacity (and intent) rest on the prosecution, citing *Maher v People,* 10 Mich 212, 217 (1862). *Maher,* in considering the state's burden of proving intent in an assault with intent to murder, commented that " * * * in some cases of murder, an actual intention to kill need not exist". A like statement appears in *Roberts,* p 415, citing 1 Bishop Cr Law (9th ed) §§ 412, 667, pp 301, 482–483, which text deals with intent presumed or inferred factually or supplied by law *(e.g.,* felony murder). And *see People v Kelley,* 21 Mich App 612, 628–629 (1970).

evidence of intent to cause such result or forecloses any other proof relevant to such intent. The defendant in any criminal case (and any party to a civil case where intent is material) may testify as to what he did in fact intend, or deny that he had a particular intent in connection with his act or omission to act. Any other evidence having possible probative value thereon ought to be admissible. That such probative value may not be conclusive or strong is not the test of its admissibility.

The relevance of such evidence is even more apparent in dealing with first-degree murder where gravity of the offense is escalated beyond ordinary murder by elements involving the defendant's state of mind: willfulness, deliberation, and premeditation. Little can be added to the scholarly treatment of the subject set out in *People v Morrin,* 31 Mich App 301 (1971), but it is appropriate to note *Morrin's* approving citation of *People v Potter,* 5 Mich 1, 8 (1858), noting that deliberating and premeditation "must be affirmatively shown, and cannot be established by those ordinary legal inferences which were sufficient at the common law to establish the general crime, but at which the statute, by dividing the crime into degrees, especially aimed".

Pertinent, too, is *Morrin's* observation (p 329) that "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem". Can there be any question that, as to such elements of the offense, the testimony of Dr. Basel that defendant had a marked impairment in her ability to understand or comprehend and appraise the consequences of her acts was relevant?

In *State v DiPaolo,* 34 NJ 279, 294–295; 168 A2d 401 (1961), *cert den,* 368 US 880; 82 S Ct 130; 7 L

Ed 2d 80 (1961), in considering whether evidence of mental condition less than insanity of the M'Naghten test quality was competent as bearing on the degree of murder, the Court said:

"The difficulty seems to be that the topic is sometimes explored under the label of 'partial responsibility' or 'diminished responsibility' or perhaps confused with some other concept intended to be so described. Both of those characterizations are misleading since they tend to connote an 'affirmative' defense designed to defeat a case the State has otherwise established and thus to suggest the intrusion of an amendment to the established basis for criminal accountability. Actually the question is simply whether there shall be excluded evidence which merely denies the existence of facts which the State must prove to establish that the murder was in the first degree.

"An unlawful homicide is presumed to be murder in the second degree. The burden is then the State's to prove facts which elevate the offense to murder in the first degree. *State v Williams,* 29 NJ 27, 44 [148 A2d 22, 31] (1959). NJS 2A:113-2 specifies what murders are in the first degree. We are here concerned with the category described as a 'willful, deliberate and premeditated killing.' The statutory language is actually an inverse statement of the natural sequence of the required mental operations. *State v Mangano,* 77 NJL 544, 546 [72 A 366, 367] (E & A) (1909). As settled by judicial construction, the first element is premeditation, which consists of the conception of the design or plan to kill. Next comes deliberation. The statutory word 'deliberate' does not here mean 'willful' or 'intentional' as the word is frequently used in daily parlance. Rather it imports 'deliberation' and requires a reconsideration of the design to kill, a weighing of the pros and cons with respect to it. Finally, the word 'willful' signifies an intentional execution of the plan to kill which had been conceived and deliberated upon. *State v Ernst,* 32 NJ 567, 579 [161 A2d 511, 517] (1960); *State v Mangano, supra* (77 NJL at p 547 [72 A at p 367]).

"The three mental operations we have just described

are matters of *fact.* The judiciary cannot bar evidence which rationally bears upon the factual inquiry the Legislature has ordered. The capacity of an individual to premeditate, to deliberate, or to will to execute a homicidal design, or any deficiency in that capacity, may bear upon the question whether he *in fact* did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did *in fact* occur must be accepted. Such evidence could be excluded only upon the thesis that it is too unreliable for the courtroom, a thesis which would not square with the universal acceptance of medical and lay testimony upon the larger issue whether there was a total lack of criminal responsibility. *Weihofen, Mental Disorders as a Criminal Defense* 176 (1954)."

But, it is argued, to permit medical testimony of this character is to introduce a new concept to Michigan jurisprudence and to sanction a subterfuge avoiding the precise standards of the *Durfee*[11] insanity defense recently affirmed in *People v Martin,* 386 Mich 407 (1971), or which would permit the defense to in effect sneak in the insanity defense without labelling it as such and without the necessity of complying with the notice statute as to the insanity defense. There are some states that adopt this view, holding that mental capacity is an all or nothing matter and that only insanity, by whatever definition thereof might prevail therein, negates criminal intent. The majority, and we think the sounder, view, however, permits such medical proof, sometimes called proof of diminished or partial responsibility, as bearing on intent generally or at least on those special states of mind where a specific intent is required or where the state of mind by definition determines the degree of the offense as here. See 1 Wharton,

[11] *People v Durfee,* 62 Mich 487, 493–494 (1886).

Criminal Law & Procedure, § 41, pp 92–93; 22 ALR3d 1228.[12]

For the reasons noted above, we think there is nothing novel in admitting testimony bearing on intent. That such testimony may be drawn from a new and evolving discipline of medical-behavioral science does not alter the basic evidentiary rules. Nor, if it did, would the fact that such testimony was previously unknown to the state's jurisprudence be a reason for excluding it. We are long past the age of the law, if there ever was one, where nothing could be done unless it had been done before.

The argument, in any event, overlooks the distinction between negating any possible criminal intent, and the state's burden to prove a specific or special kind of state of mind as an element of a particular offense. Thus in *People v Wells,* 33 Cal 2d 330, 356; 202 P2d 53, 69 (1949), it was said:

"It must be borne in mind that insanity as a defense is one thing and that proof of the existence or nonexistence of the specific essential mental state, disjoined from any question of legal sanity, is quite another thing. The enactments are to be applied as written and neither extended nor curtailed.

"Triers of fact are often required, as were the jury in this case, to ascertain whether a nonobjective fact, a certain intent or state of mind, existed. In a prosecution

---

[12] *See also* Goldstein, *The Insanity Defense* (Yale Univ Press ed, 1967), ch 12.

And note the ALI, Model Penal Code, § 4.02(1), which provides: "(1) Evidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense."

In the comment to this section it is said that "If states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence *to the same extent as any other relevant evidence".* (Emphasis added.)

for felonious homicide a trier of fact may have to determine whether the accused had that state of mind which would make the killing justifiable in self-defense —whether he acted only under the influence of honest, reasonable fear * * * ; whether he acted in the heat of passion resulting from provocation which would naturally arouse the passions of the ordinary, reasonable man * * * , in which case the offense is manslaughter; whether 'the circumstances attending the killing show an abandoned and malignant heart' * * * , and not a more severely condemned criminal intent or state of mind, in which case the offense is a type of second degree murder; whether the killer has not only acted with 'malice aforethought' but also formed and carried out a deliberate, premeditated intention to kill * * * , in which case the offense is a type of first degree murder. Burglary requires proof of entry with specific 'intent to commit grand or petit larceny or any felony' * * * . In each of such cases the intention is manifested by, and found by the trier of fact from, 'the circumstances connected with the offense' * * * . And in each case where such intention must be determined the trier of fact should have the advantage of being informed as completely as possible of such circumstances, in aid of appraisement of the ultimate, nonobjective fact." (Citations omitted.)

And this distinction has already been drawn in Michigan as to intoxication in specific intent offenses. See *People v Kelley,* fn 10, *supra,* and cases cited therein.

The proposed testimony of Drs. Willis and Basel being material and relevant, and there appearing to be no good reason in law or public policy for excluding the same, the matter is reversed for new trial. On retrial, the court should instruct the jury on the lesser included offense of manslaughter, which instruction was omitted on the first trial.

All concurred.