Argued June 27, affirmed July 29, reconsideration denied
September 4, petition for review denied October 15, 1974

# STATE OF OREGON, *Respondent, v.* RONALD KENNETH DRAVES, SR. (No. 73-3477), *Appellant.*

524 P2d 1225

*John K. Hoover,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

## SCHWAB, C. J.

Defendant was convicted of murder and on appeal asserts that the trial court should have instructed the jury on the effect of circumstantial evidence in the specific terms defendant requested, and that the trial court should not have instructed the jury on both the elements of intentional murder, ORS 163.115 (1)(a), and reckless murder, ORS 163.115 (1)(b).

The facts developed during defendant's lengthy trial are rather complex. The events that culminated in the homicide occurred around a house in Springfield owned by the victim, George Puls. Leonard Nicola, Puls's brother-in-law, lived with Puls.

The evening of August 15, 1973, defendant took Nicola's motorcycle which was parked in front of Puls's house, rolled it down the street and around the corner. The state argued at trial that defendant intended to steal the motorcycle. Defendant testified he intended to make it appear that somebody else had stolen the motorcycle, then pretend to help find and return it, thereby earning Nicola's trust and making it easier to steal the motorcycle after it received needed repairs.

Nicola and Puls, noticing the motorcycle was gone, ran outside. They saw Ray Kessel and, assuming he was involved in the theft, assaulted him. Defendant heard the commotion from around the corner where he had taken the motorcycle and came to Kessel's defense with a drawn knife. Defendant's knife-wielding resulted in cutting Nicola's knuckle and Puls's back.

Nicola ran into Puls's house to get a gun. Puls, Kessel and defendant calmed down a little; they stopped fighting, but tension remained high as words were

exchanged about who was responsible for the motorcycle theft, the various wounds, etc. This acrimonious conversation continued as those three went briefly to a neighbor's house.

Puls, Kessel and defendant then left the neighbor's house and walked toward Puls's pickup truck parked nearby. Just after they reached the truck, Nicola came out of Puls's house onto the front porch with a rifle he had found and loaded. There is conflicting evidence as to what then ensued. It is sufficient to note that the jury could reasonably have concluded that defendant attempted to take Puls's pickup, possibly to consummate the theft of Nicola's motorcycle parked around the corner; that Puls attempted to stop him; and that defendant then stabbed Puls first in the chest and then in the neck. Puls died the next day.

The medical testimony was that either the chest or neck wound could have been fatal, and that death was most likely caused by the neck wound. The doctors did not regard several other knife wounds Puls had suffered, including the back wound defendant admitted he inflicted at the beginning of the altercation, as being potentially fatal.

Specifically, regarding the two more serious wounds, Nicola testified that when he came out of Puls's house after getting the rifle he saw Puls holding his hand over his chest, heard Puls say something to defendant in a pleading voice, and then saw defendant stab Puls in the neck. Kessel, who was standing nearby when this occurred, testified that he saw defendant and Puls wrestling, and then Puls run away bleeding profusely.

Defendant first assigns as error the failure of the trial court to give Uniform Jury Instruction No. 202.05 which he requested. It reads:

"There are two types of evidence in this case upon which the State may rely. One is direct evidence—such as the testimony of an eyewitness. The other is circumstantial evidence—the proof of a chain of circumstances pointing to the commission of the offense. The proof may be by either type, or a combination of both.

"When circumstantial evidence is relied upon for conviction, it must not only coincide with, render probable and be consistent with the guilt of the accused, but it must be inconsistent with any reasonable theory of his innocence and incapable of explanation upon any other reasonable basis than that of guilt."

The state requested a different instruction on circumstantial evidence. Both attorneys argued the merits of the alternative requested instructions at length. The trial court, generally following the state's requested instruction, told the jury:

"Now, there are two types of evidence in this case upon which the state may rely. One is direct evidence, such as the testimony of an eye witness. The other is circumstantial evidence. That is the proof of a chain of circumstances pointing to the commission of the offense. The proof may be by either type or a combination of both. In any event, you may not find the defendant guilty unless all the evidence taken together leaves you satisfied of his guilt beyond a reasonable doubt."[1]

---

[1] Later in its instructions the court elaborated on the reasonable doubt standard:

"The burden is upon the state to prove the guilt of the defendant beyond a reasonable doubt. Reasonable doubt means an honest uncertainty as to the guilt of the defendant. A reasonable doubt exists when, after careful and impartial con-

■ This instruction substantially repeated the first paragraph of the uniform instruction defendant requested. It deviated from defendant's requested instruction, however, in not using the inconsistent-with-any-theory-of-innocence language in the second paragraph of the uniform instruction.

This language came into Oregon jurisprudence in *State v. Dennis,* 177 Or 73, 77, 159 P2d 838, 161 P2d 670 (1945). More recently, the Oregon Supreme Court stated that the instruction based on *Dennis* "should not be regarded as establishing a standard more severe than the usual concept of reasonable doubt." *State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974), quoting from 1 Wharton's Criminal Evidence 18, § 12. In other words, an instruction based on the *Dennis* formulation is merely one way of telling a jury, perhaps in unnecessary detail,[2] that it must find the defendant guilty beyond a reasonable doubt. *See, State v. Wright,* 12 Or App 73, 75, 504 P2d 1065, Sup Ct *review denied* (1973). Any other instruction that accomplishes the same thing is equally acceptable. *State v. Guse,* 248 Or 143, 432 P2d 516 (1967). We hold the court's instructions in this case adequately informed the jury of the requirement of finding guilt beyond a reasonable doubt.

---

sideration of all of the evidence in the case, you do not feel convinced to a moral certainty that the defendant is guilty.

"Proof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your own affairs. The law presumes that the defendant is innocent, and this presumption follows the defendant until guilt is proved beyond a reasonable doubt."

[2] Oregon appellate decisions do not seem to contain an answer to a rhetorical question the trial court asked during a colloquy with counsel: "* * * I really don't know why the jury has to be burdened with the distinction between direct and circumstantial evidence * * *."

■■ Moreover, when there is substantial direct evidence, it is generally not necessary to instruct the jury on the law of circumstantial evidence. *State v. Thomson,* 203 Or 1, 278 P2d 142 (1954); *State v. Nortin,* 170 Or 296, 133 P2d 252 (1943). In the case at bar we agree with the trial court's observation that "this really isn't a * * * circumstantial evidence case" because there was substantial direct evidence of guilt, specifically, the testimony of the eyewitnesses Nicola and Kessel, summarized above. For this additional reason we find no error in this aspect of the court's instructions.

Defendant's second assignment of error is that the trial court should not have instructed the jury on the elements of reckless murder. The court instructed:

"Now, with regard to the charge of murder, Oregon law provides that a person commits murder if he intentionally causes the death of another human being or if he causes the death of another human being recklessly, under circumstances manifesting extreme indifference to the value of human life. And in order to establish murder in this case it is necessary for the state to prove beyond a reasonable doubt the following elements * * *. Third, that the defendant either intentionally caused the death of Stanley George Puls, Jr., or that the defendant caused the death of Stanley George Puls, Jr. recklessly under circumstances manifesting extreme indifference to the value of human life * * *.

"Now, intentionally means that a person acted with a conscious objective to cause a death. Recklessly means that a person was aware of and consciously disregarded a substantial and unjustifiable risk that the death would occur. The risk must be of some nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in this situation."

Defendant's argument that the court should not have instructed on the elements of reckless murder presents three contentions: (1) stabbing a specific individual cannot, as a matter of law, be reckless murder; (2) the record in this case does not warrant a reckless murder instruction; and (3) since the indictment in this case charged only intentional murder, defendant was not on notice he would have to defend against a reckless murder theory.

(1) The relevant statute, ORS 163.115, provides in part:

"* * * [C]riminal homicide constitutes murder when:

"(a) It is committed intentionally; or

"(b) It is committed recklessly under circumstances manifesting extreme indifference to the value of human life * * *."

Defendant interprets this statute as providing that a knife attack on a specific individual can only be intentional murder, if murder at all, and that reckless murder can only be committed by, for example, a person throwing a knife into a crowd or slashing his way through a crowd. To support this analysis, defendant relies on the following commentary by the draftsmen:

"* * * [ORS 163.115 (1)(b)] is meant to cover situations such as one shooting into a crowd or an occupied house or automobile * * *." Commentary, Proposed Oregon Criminal Code 87 (1970).

Defendant has been misled by these examples. The reckless murder statute was intended to be and is broader than just the examples suggest. This is apparent from additional comments by the draftsmen and the Commentary to § 210.2 (1)(b) of the Model Penal Code, from which ORS 163.115 (1)(b) was derived.

The additional comments of the draftsmen state:

"* * * The draft also describes as murder the killing of another 'recklessly under circumstances manifesting extreme indifference to the value of human life.' This corresponds fairly closely to the language in [former] ORS 163.020 which defines such killing as second degree murder * * *.

"* * * * *

"The draft section makes no mention of murder defined at the common law as death caused by one intentionally inflicting serious bodily harm on another. It is believed that these kinds of situations are more satisfactorily judged by the standards of recklessness and extreme recklessness as to causing death." Commentary, Proposed Oregon Criminal Code 86-87 (1970).

To the extent that the reckless murder statute parallels the former second degree murder statute, this refutes defendant's claim that reckless murder cannot arise from an attack on a specific individual. To the extent that the reckless murder statute is intended to cover some deaths resulting from serious assaults, this also refutes defendant's claim that reckless murder cannot arise from an attack on a specific individual.

The Commentary to the Model Penal Code is even more explicit:

"* * * Paragraph (1) (b) reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished for this purpose from homicides committed * * * [intentionally]. Recklessness * * * presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where recklessness should be assimilated to * * * [intentional con-

duct]. The conception that the draft employs is that of extreme indifference to the value of human life. The significance of * * * [intentional conduct] is that, cases of provocation apart, it demonstrates precisely such indifference. Whether recklessness is so extreme that it demonstrates similar indifference is not a question that, in our view, can be further clarified; it must be left directly to the trier of the facts * * *.

"* * * * *

"Insofar as the draft includes within the murder category cases of homicide caused by extreme recklessness, though without purpose to kill or even injure, it reflects both the common law and much explicit statutory treatment usually cast in terms of conduct evidencing a 'depraved heart regardless of human life' or some similar words. Examples usually given include shooting into a crowd, an occupied house or an occupied automobile, *though they are not of course exhaustive.*

"Some indication of the content of this concept in existing law, as a means of differentiating murder and manslaughter, may be afforded by the following decisions:

"* * * * *

"In * * * [a] well-known case, the defendant threw a heavy beer glass in the direction of his wife. The glass hit a lighted oil lamp she was carrying causing a fire which resulted in her death from burns. The defendant made no effort to extinguish the fire. The defendant asked the court to instruct the jury to acquit if it had a reasonable doubt of his intention to do bodily injury. The trial judge gave the requested instruction but preceded it by 'Unless all the circumstances of the killing . . . show an abandoned and malignant heart on the part of the defendant.' The appellate court held this was murder whether he intended the glass to hit his wife, someone else, or whether he threw the glass with 'general malicious recklessness, disre-

garding any and all consequences.' *Mayes v. People,* 106 Ill. 306 (1883).

"\* \* \* \* \*

"In *Myrick v. State,* 199 Ga. 244, 34 S.E.2d 36 (1945), defendant's claimed intention was to shoot 1½ feet over the victim's head to scare him. The court thought it was a question for the jury whether 'this act was such a reckless disregard for human life as was the equivalent of a specific intent to kill' \* \* \*." Model Penal Code, Tentative Draft #9, 29-30 (May 8, 1959). (First emphasis supplied.)

■ As these materials reveal, the reckless murder statute is not limited to generally reckless conduct that causes death, such as shooting into a crowd with no specific target in mind. The statute also covers specifically reckless conduct, such as shooting at a given individual with no "intent," but with an awareness of and utter disregard for the possible consequences. *Cf., State v. Gardner,* 16 Or App 464, 518 P2d 1341, Sup Ct *review denied* (1974).

Thus, the murder statute creates a single crime that can be committed in alternative ways. This is similar to the new theft statutes under which a single crime can be committed in several ways. *See, State v. Jim/ White,* 13 Or App 201, 508 P2d 462, Sup Ct *review denied* (1973). The trial court accurately summarized the murder statute when it instructed the jury:

"\* \* \* Oregon law provides that a person commits murder if he intentionally causes the death of another human being or if he causes the death of another human being recklessly, under circumstances manifesting extreme indifference to the value of human life \* \* \*."

(2) Defendant contends that if we hold the reckless murder statute applicable to attacks on specific individuals, as we have, there is nevertheless no evi-

dence to support a reckless murder instruction in this case. We disagree.

■ The action element of intentional murder and reckless murder is the same—causing the death of another human being. The only distinction is in the accompanying mental state—intentional versus extreme recklessness. The accompanying mental states in murder cases, as in all other criminal cases, must usually be inferred from the evidence concerning the action element.

■ In this case, there was direct evidence, obviously believed by the jury, that defendant stabbed the victim several times. Other than inferences to be drawn from this fact, there is nothing to establish what defendant's mental state was when he stabbed the victim. It could be inferred that defendant literally intended to cause the victim's death, although this inference is somewhat difficult because no motive is suggested for such a vicious and senseless act. It could also be inferred that defendant simply made a knife thrust at the victim, not with the intent to kill or injure, but with the awareness he was creating a substantial danger and with conscious disregard of that danger. Either of these inferences could reasonably be drawn from this record. Therefore, there was evidence to support the trial court's instruction on reckless murder.

■■ (3) What we have already said substantially disposes of defendant's claim that he was not on notice that reckless murder could be an issue in this case. Regardless of whether the indictment charged intentional murder or reckless murder, defendant would have known that the evidence about the action element —causing another's death—would have been exactly the same. The accompanying mental state is inferred

from this evidence, not something capable of direct proof except possibly in the rarest of cases. Other than in arguments to the jury about what inferences to draw from the evidence, we fail to see how a murder defense would ever be conducted differently depending upon whether the indictment read intentional murder or reckless murder. This is a single offense that can be committed in alternative ways. Any murder indictment, combined with a correct understanding of the murder statute, puts the defendant on sufficient notice of what he must defend against.

Affirmed.