**STATE of Utah, Plaintiff and Respondent,**

v.

**Teresa Marie NICHOLSON, Defendant and Appellant.**

**No. 15359.**

Supreme Court of Utah.

Sept. 21, 1978.

John T. Caine of Public Defender Ass'n, Ogden, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Michael L. Deamer, Craig L. Barlow, Asst. Attys. Gen., Salt Lake City, for plaintiff and respondent.

PER CURIAM:

The defendant was charged and convicted of second degree murder (Sec. 76–5–203, Utah Code Annotated 1953)[1] for the death

---

---

1. 76–5–203. Murder in the second degree.— (1) Criminal homicide constitutes murder in the second degree if the actor:

(a) Intentionally or knowingly causes the death of another; or

(b) Intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another; or

of her 19 month old son, Troy, whose brother was named Travis, in a trial to the court, sitting without a jury.

This case is unique in that defense counsel conceded substantially all of the gruesome facts condensed below. The only defense was a psychotic behavioral personality.

Defendant was married to a service man in March, 1975, and the twins were born the next May. He was assigned to an isolated air base in Alaska, and went there about nine months later, in January, 1976. Testimony at the trial suggested that after he left, defendant's mental problems, which an expert psychiatrist testified she had, increased to plague her with some sort of uncontrollable disposition to shun and neglect the infants; and although she contended that she fed them until the death of one and near-death of the other, the following facts belie her contention and make questionable her credibility.

She constantly neglected and mistreated the twins leaving them unattended during the day and many times all night long, leading to progressive emaciation and malnutrition, so that Troy, at 19 months and at the time of his death, weighed but 14.5 pounds, had a total lack of body fat, serious dehydration, a severe diaper rash, sloughing of the skin, bleeding, and heavily infected lungs, suggesting the cause of death. The child was found dead, and naked, on a sofa on December 15, 1976. His dying brother, Travis, recovered rapidly under the care of a physician.

During the time her husband left and the time of the death of the child, the defendant worked, associated with others day and night, frequented a service men's club, slept regularly once or twice a week with one service man and others, appeared to be kind and loving, no one noticing anything abnormal about her.

Her own counsel, in its brief conceded that:

She did not do housework, she allowed the home in which she lived to become disheveled, cluttered, and eventually in a condition in which no human being would, under normal circumstances, live. The twin boys grew weak from lack of attention, nutrition, and care. They did not grow in a normal manner, nor did they progress intellectually or physically as other children of a similar age. By November of 1976, the children had grown emaciated from lack of food and proper care, and had begun to evidence symptoms of malnutrition and dehydration.

Counsel for the State's brief added some evidence supported in the record to the effect that:

The house was filthy. Clothes and garbage covered the floors. There was spoiled food and dirty diapers throughout the house. The trash, garbage and unused food and so forth started at an angle up to the walls to a height of about three feet. In the babies' bedroom 200–300 dirty diapers were in the cribs and on the floor, and hundreds or thousands of flies were present. The bathtub had approximately 2 inches of human feces in it and the toilet and sink were soiled in the same manner. Pornographic magazines were found throughout the house. The odor was overwhelming.

A child specialist called by the defense concluded that the above was symptomatic of a perpetrated child neglect syndrome from which the twins became victims. Other defense witnesses said defendant at times was very contentious, but also was kind and considerate to her children, which seems to be inconsistent under the facts. A social worker with a master's degree said she was suffering from severe depression while her husband was away and that her relationship with another individual caused some emotional problems until she gradually became totally unaware of the situation and circumstances of her children. A psychiatrist said she was suffering from a severe, psychotic depression of a chronic type—this after an interview of between 15 and 45 minutes, without any clinical tests,

(c) Acting under circumstances evidencing a depraved indifference to human life, he recklessly engaged in conduct which creates a grave risk of death to another and thereby causes the death of another; or . . . .

and that she did not know what to do for her children, i. e., was helpless.

On the other hand, an expert pediatrician and physician, called by the State, said that parents who neglect their children typically exhibit symptoms of depression, isolation and stress, though strangers may not detect such symptoms. Not even her mother noticed any change in behavior prior to Troy's death. Nor did her male friends with whom she had been sleeping while her husband was away. Her own testimony that she regularly fed the children through October, 1976, and never left the children alone until the middle of November, and that she did feed them until the 10th or 12th of December, does not square with the hard, undenied facts above, resulting in Troy's death, nor with the fact that she permitted no one in the house after May or June, 1976—not even her father and mother whom she watched from the window, refusing to answer the door, but later telling them she had been asleep in the basement.

The trial court said, "the testimony of Wheelwright (psychiatrist) and Payne (mental health worker) is grossly inconsistent with the evidence. The court cannot accept them. The court finds no convincing evidence of hallucinations, . . . of depression, . . . irresistible impulse, . . . inability to move oneself independently."

Defendant asserts one point on appeal, the thrust of which is that the trial judge substituted his own and different judgment for that of expert, unrefuted psychiatric testimony to the effect that defendant did not know what she was doing because of psychotic depression of a chronic type—the trial judge finding that she was a thrill-seeking criminal.

Sec. 76–5–203 (footnote 1 supra), has several subdivisions. The first is where one "intentionally or knowingly causes the death of another." The prosecutor in his argument, conceded that the facts would not support the charge under that section, whether right or wrong; hence that section will not be considered in this opinion. As to the next two sections ("b" and "c"), we think the record reflects a fact situation proper for determination by a jury, and the trial court here, acting as such arbiter of the facts, was justified in finding guilt, particularly under subsection "c".

Defense counsel indulges in a lengthy dissertation about the historical changes in statutes, concerning what is "malice," comparing manslaughter and murder legislation that leads to some kind of conclusion that 76–5–203 doesn't mean "depraved indifference" but something different and greater than "negligent" or "reckless," which requires a higher degree of proof. He seems to be suggesting that in this case defendant was simply negligent, or careless, or reckless; and that consequently there was insufficient evidence to reflect "depraved indifference." The trial court thought otherwise, and it is this Court's problem to determine whether the "facts" show "guilt" under the wording of the statute, failing which, the trial court would be arbitrary or capricious and that the rule should be that the trial court must accept the expert testimony. Defense counsel cites *People v. Lynch*, 47 Mich.App. 8, 208 N.W.2d 656 (1973), as the leading case on the subject—a case of starvation of a child, where the Michigan court reversed because the trial court excluded expert testimony. It is suggested that the case is not pertinent at all here, because expert testimony *was* admitted and *is* the very basis for this appeal. Other cases cited by the defense are neither convincing nor compelling, because generally they concede that if there was malice, the conviction would be affirmed. Defense counsel seems to ignore the rule that "malice" may be "express" or "implied," as pointed out by the State, and as reflected in *State v. Kelsey*, Utah, 532 P.2d 1001 (1975) where a 3½ year old child was severely beaten and died; and in *Pallis v. State*, 123 Ala. 12, 26 So. 339 (1899) a case of exposure wherein it was stated:

> For example, if from an infant of tender years, the person under obligation to provide for it wilfully withholds needful food . . . thereof the child dies, he commits murder.

See also *People v. Burden*, 72 Cal.App.3d 603, 140 Cal.Rptr. 282 (1977)—starvation of a 5 month old child; *Gibson v. State*, 476 P.2d 362 (Okl.Cr.1971)—prisoner grabbing steering wheel of sheriff's car, under a "depraved mind" statute; *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487 (1974)—killing a policeman when bomb went off, under "circumstances manifesting indifference to life"; *State v. Draves*, 18 Or.App. 248, 524 P.2d 1225 (1974)—reckless shooting into a crowd; *Wagner v. State*, 76 Wis.2d 30, 250 N.W.2d 331 (1977)—drag-racing under "depraved mind" statute; *State v. Day*, Utah, 572 P.2d 703 (1977)—"depraved indifference" statute, saying it is a fact for the jury; and a good many other cases to like effect.

■ Defendant's discussion as to the meaning of the language of the statute is academic and tends to obfuscate the normal interpretation of familiar words, and there appears to be nothing ambiguous or uncertain in the language, particularly that in "c". The believable facts in this case fit the proscription of that subsection;[2] and this all seems to be emphasized by the fact that the trial court obviously was not impressed by the expert testimony offered by the defense in the light of other and more convincing evidence. There was nothing in the record here that indicates the trial court's finding of guilt was offensive to any construction of the words in the statute or was provoked by any unusual circumstances requiring the application of any other statute to the facts of this case, justifying defendant's "relief sought on appeal" to the effect that the conviction should be changed from second degree murder to either "manslaughter" or "negligent homicide."

The judgment of the trial court is affirmed.

MAUGHAN, J., concurs in result.

2. *State v. Day*, 572 P.2d 703 (Utah 1977); Model Penal Code Tent. Draft # 9; *Commonwealth v. Hall*, 322 Mass. 523, 78 N.E.2d 644 (1948).

1. Section 76–5–202 (first degree) and 76–5–203 (second degree).

WILKINS, Justice (concurring in result).

The main opinion cites cases and discusses principles of law which were pertinent to our criminal code prior to 1973, at which time the Utah Legislature enacted the present statutes under which defendant was convicted. The term "malice" and "malice aforethought" are not used in the present *homicide* statutes. The term "malice" was part of the prior law. Likewise, the prior statutes provided that "malice" was "express" or "implied" while the new statutes use entirely different language. We must apply the new law, not engraft the old terms into the new statute when the Legislature has seen fit to change those terms. All statutory references herein are to Utah Code Annotated, 1953, as amended.

Some distinctions among the degrees of criminal homicide in the 1973 Criminal Code relate to the state of mind of the actor in committing the offense. Thus the offense is murder if the state of mind is intentional or knowing;[1] manslaughter, if the actor is reckless in his conduct;[2] and negligent homicide if the actor is criminally negligent.[3] These words, "intentionally", "knowingly", "recklessly" and "negligently" are defined in Section 76–2–103.

Subsections (a) and (b) of the second degree murder statute, Section 76–5–203(1), require intent on the part of the actor, viz., intent to cause death under subsection (a), and intent to cause serious bodily injury under subsection (b). The State concedes that it did not prove such intent on the part of defendant. Subsection (c) of that statute, however, provides:

(1) Criminal homicide constitutes murder in the second degree if the actor:

\* \* \* \* \* \*

(c) Acting under circumstances evidencing a depraved indifference to human life, he recklessly engaged in conduct which creates a grave risk of death to

2. Section 76–5–205.

3. Section 76–5–206.

another and thereby causes the death of another . . . .

The term "depraved indifference to human life" is not defined in the Code.

It is to be noted also that a criminal homicide caused by "recklessness" is manslaughter under Sec. 76–5–205.

Defendant argues that in order to constitute second degree murder conduct must be so extremely reckless as to be *equivalent* to an intentional or knowing killing.

The comments to the Model Penal Code, upon which our 1973 Criminal Code is based, reflect the prompting of defendant's reasoning:

> 2. *Recklessness Manifesting Extreme Indifference.* Paragraph (1)(b) [of the Model Penal Code] reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished for this purpose from homicides committed purposely or knowingly. Recklessness . . . presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where recklessness should be assimilated to purpose or knowledge. The conception that the draft employs is that of extreme indifference to the value of human life. The significance of purpose or knowledge is that, cases of provocation apart, it demonstrates precisely such indifference. Whether recklessness is so extreme that it demonstrates similar indifference is not a question that, in our view, can be further clarified; it must be left directly to the trier of the facts. If recklessness exists but is not so extreme, the homicide is manslaughter. . . . [Model Penal Code, Tentative Draft # 9, American Law Institute; 1959, p. 29.]

Defendant further argues that inasmuch as "depraved indifference to human life" was intended by the Legislature to mean such extreme recklessness as to be equivalent to "intent", the State has the burden of proving defendant's state of mind; that the State failed to present any evidence with regard to defendant's state of mind; that the only evidence presented thereon was the testimony of defendant's psychiatrist who was of the opinion that defendant was in such extreme depression that she was incapable of helping herself or her children; that the Court as the trier of fact, erred in rejecting this unrefuted evidence; and that, though defendant's conduct may have been reckless or negligent, the recklessness was not so gross as to amount to "intent", or "knowledge" as defendant did not have the requisite "awareness" of the risk involved in her conduct.

Section 76–2–103 provides:

A person engages in conduct:

(1) Intentionally, or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his *conscious objective* or desire to engage in the conduct or cause the result.

(2) Knowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct *when he is aware that his conduct is reasonably certain to cause the result.*

(3) Recklessly, or maliciously, with respect to circumstances surrounding his conduct or the result of his conduct when *he is aware of but consciously disregards a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(4) With criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct or the result of *his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the*

*result will occur.* The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint. [Emphasis added.] [4]

As noted, ante, it was the intention of the drafters of the Model Penal Code (and hence our Legislature which substantially adopted it) to leave to the finder of fact the determination of whether a defendant's reckless conduct is so extreme as to be equivalent to purpose or knowledge (i. e., intent) from the circumstances surrounding the creation of the risk of death. Since an intentional or knowing homicide is second degree murder under subsection (a) of the statute, I do not believe that the Legislature intended that "depraved indifference to human life" under subsection (c) should be measured by the same "awareness" of the certainty that the risk would result in death as the word "knowing" would entail. Instead, the greatness of the risk, and the lack of justification for the creation of that risk are the tests.

The District Judge found the psychiatric testimony inconsistent with other evidence.

The risk of death created by this defendant was great. The home was dangerously contaminated. The children were fed erratically with quick and easy foods of low nourishment. The children were left alone for extended periods of time in those contaminated surroundings. Even after the defendant knew that Troy, the decedent, was ill and had not taken food or water, she continued to leave the children alone during the next four days, for long periods of time during the day and night, to pursue her own interests.

All of the circumstances reveal a great risk of the death of this child, and very little justification, if any, for defendant's conduct. The Court determined that the defendant's actions "evidence a depraved indifference to human life," and the evidence supports this determination.

I therefore concur in the holding of the majority of the Court.

---

4. As noted in the first paragraph of this concurring opinion, "malice" (as well as other derivations) does not appear in the homicide statutes, viz., Part 2 of Chapter 5, Title 76, though it does appear in Sec. 76–2–103 under definitions.