652 So.2d 720 (1995)
Bessie Marie CLAYTON,
v.
STATE of Mississippi.
No. 91-KA-00459-SCT.
Supreme Court of Mississippi.
March 9, 1995.
David O. Bell, Oxford, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
*721 Before PRATHER, P.J., and PITTMAN and McRAE, JJ.
PITTMAN, Justice, for the Court:

STATEMENT OF THE CASE
On March 31, 1989, pursuant to § 97-3-19(1)(b) of Mississippi Code Annotated, Bessie Marie Clayton was indicted for the Depraved Heart Murder of her daughter Anginetta Clayton. A trial on the merits was had on April 9th and 10th, 1990. Subsequent to the State resting its case, the defense moved for a directed verdict, which was overruled by the trial court. The defense then proceeded with its case and put on Linda Clayton and Carolyn Clayton, two of the defendant's sisters. At the close of all the evidence, the defense renewed the motion for a directed verdict, which was in turn overruled by the trial court. After being instructed on murder and manslaughter, the jury found the Defendant guilty of murder.[1] The court on April 12, 1990, entered a Judgment of Conviction and Sentence of life imprisonment. In addition, the court ordered that "the sentence of life imprisonment imposed hereinabove shall be consecutive to the sentence previously imposed by this Court in Lafayette County Circuit Court cause number 12,921."[2]
Subsequently and on April 19, 1990, Defendant filed a Motion for J.N.O.V. or in the alternative for a New Trial. Thereafter on April 30, 1990, the lower court overruled said Motion.
Clayton appeals to this Court and assigns the following as reversible error:
I. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR DIRECTED VERDICT BOTH AT THE END OF THE STATE'S CASE AND AT THE END OF THE CASE BECAUSE THE STATE'S EVIDENCE WAS INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT AND TO THE EXCLUSION OF EVERY HYPOTHESIS CONSISTENT WITH HER INNOCENCE THAT THE DEFENDANT HAD COMMITTED AN ACT EMINENTLY DANGEROUS TO OTHERS AND EVINCING A DEPRAVED HEART, REGARDLESS OF HUMAN LIFE
II. THE ADMISSION OF CERTAIN PHOTOGRAPHS OF THE BODY HAD NO PROBATIVE VALUE AND WAS PREJUDICIAL

STATEMENT OF THE FACTS
Bessie Marie Clayton, a resident of Oxford, Mississippi, had five children. Bessie and her children lived in a trailer off of Highway 30 with her mother and two sisters, Carolyn and Linda. She at times also resided with a man in a home off of South Lamar street. The following summarizes the additional facts developed at trial.

F.A. Buddy Roy
Buddy Roy, Lafayette County Medical Examiner, arrived at the Clayton trailer around 6:00 P.M. on January 17, 1989. He saw a child wrapped in a blanket on the couch and was informed that the child had been dead for a period of time. When Roy arrived, Bessie Marie Clayton and Carolyn Clayton were present in the trailer. Roy proceeded to take photographs of the scene. The child was then transported to the hospital and an autopsy was performed the next day, January 18, 1989, by Dr. Brooks Allison. Roy was present when the autopsy was performed but took the photographs of the body prior to the autopsy being performed. Roy described the child's skin as "leathery like" and the photographs depicted "severe dehydration ... and also depicts a dilated anal canal." While at the hospital, Roy also examined the child's medical records.
At the scene of the death, Roy inquired of Bessie Marie about any medications that the child was taking and was shown a bottle of Dilantin with the date of prescription being January 6, 1989. Roy further testified that:

*722 The bottle ... was prescribed for a total of 240 cc of Dilantin. It was approximately 12 cc's of medication removed from the bottle, and on the prescription I noticed that the medication was to be given a dosage of 4 cc's three times per day. The child's death occurred on January 17, 1989. The total usage from the bottle should have been approximately 120 cc's of Dilantin under normal usage... . It was approximately 12 cc's only used from the bottle.
Roy testified that the certificate of birth for Anginetta LaWan Clayton showed that she was born on May 12, 1986. The certificate of death showed that she died on January 17, 1989, as a result of "renal thrombosis with infarcts, both kidneys due to consequences of severe dehydration, severe malnutrition, inanition and starvation."
After being informed by Clayton that she was the child's mother and the "child had been sickly on several occasions", Roy called Sheriff Buddy East.

F.D. "Buddy" East
Lafayette County Sheriff Buddy East arrived at the hospital and proceeded to view the deceased. East knew that Clayton had other children and that the Welfare Department "had been working with Ms. Clayton about her children... ." He called the Welfare Department who sent representatives to the hospital that night. After receiving a verbal court order to remove the rest of the children from the trailer, East and the representatives went to the trailer. East testified that the trailer was "dirty, nasty, filthy; and we took the children at that time into custody and turned them over to the Welfare Department." East stated that he didn't see any food in the home and that "it wasn't fit for a dog to live in." While at the trailer, East also recovered the bottle of Dilantin. The Sheriff called Bessie Marie Clayton in and informed her that he was going to charge her "if this baby died from malnutrition or died from not being properly cared for." During this exchange, Clayton informed East that she "didn't stay out there all the time: that she lived on North Lamar... ." East testified that Bessie Clayton (defendant's grandmother) was present in the trailer when the authorities arrived to collect the children.

Dr. Joe Harris
Harris, a practicing pediatrician in Oxford, Mississippi, saw and treated Anginetta Clayton on several occasions. Harris first treated Anginetta in October of 1986. He testified that the child had numerous medical problems including: microcephaly (where the head is very small because the brain does not grow) and spastic quadraplesis (where both arms and legs were very stiff). At the time he first treated Anginetta, she was 6 months old and weighed 16 pounds "which is fairly normal for that age." Anginetta was hospitalized in November of 1986 for bronchiolitis and was later sent to Le Bonheur Hospital in Memphis, Tennessee, for further neurological evaluation.[3] On January 30, 1987, Anginetta was seen by Dr. Walcott for a seizure disorder in the Oxford, Mississippi emergency room. She was given Phenobarbital for the disorder and weighed about 15.4 pounds. During a follow-up visit with Dr. Harris the next day, Harris diagnosed Anginetta with an ear infection in both ears. Anginetta was hospitalized from May 14th through May 16th, August 22nd through August 25th, and again in September of 1988, for status epilepticus/repeated seizures. At the time of the September 1988 hospitalization, Anginetta weighed 16.5 pounds. Harris prescribed Dilantin for the seizures and stated that nausea and vomiting were common side effects.
Harris testified as to the birth defects including the microcephaly, stiffness and seizures and stated:
She didn't develop normally like a normal child would be expected to develop and grow and thrive.... The nerves to all her body her arms and legs were affected ... they were what we call spastic, very stiff... . She had developed seizures; and this again, is probably from her congenital *723 problem. So she was on medication for her seizures.
* * * * * *
She couldn't really do a whole lot of anything. Her mother had to take care of her all the time. She required pretty much constant care. Feedings were difficult too. The child couldn't take normal feedings and couldn't be fed like a child her age should be fed or feed herself. She had to be fed and cared for continuously, ... She never developed past a three or four month's age level as far as she had developed and as far as she was ever going to develop.
Harris stated that the child's condition and ailments warranted placing the child in a medical facility for constant care but that there was not a facility that would take a child of that age.
Harris also testified that he informed Clayton that if Anginetta was not given her medication and taken proper care of, she could die. Finally, Harris labeled the condition and decline of the child from September of 1988 until January of 1989 as noticeable and "a chronic process."
Ultimately, Harris testified that notwithstanding all of her illnesses and conditions, Anginetta should have demonstrated an "upward trend in her growth pattern." He further stated that:
The precipitous drop we see in her weight shortly before death and the autopsy report, showing renal vein thrombosis, and severe inanition or severe malnutrition doesn't reflect her disease process. Her disease doesn't cause that. With proper care she still would have grown somewhat, but she didn't. She lost weight.

Dr. Brooks Allison
Dr. Allison, a pathologist for Oxford-Lafayette Hospital, performed the autopsy on Anginetta Clayton on January 18, 1989, and determined the cause of death. Allison stated that blood clots had formed in the child's veins which drain the kidneys as a result of severe malnutrition and dehydration. Allison discussed and described the total lack of moisture in the skin, the presence of dry fecal material in the child and the process causing the renal thrombosis with acute infarcts. Allison said the fecal material was "entirely consistent with severe dehydration of the body." He further stated that the material "could have been there a very long time" and that the baby could have been given food and was not at that time able to digest it. In his report, Allison also used the term "marasmic", which describes "babies that had severe protein and calorie deprivation or malnutrition ..." Dr. Allison determined that the child had lost approximately "36 percent body weight in about four months, over a third of this baby's body weight in four months." He further opined that:
[T]he loss of weight didn't have anything to do with the problems with seizure disorder, fever, and retardation... . [T]he immediate cause of death was thrombosis of the renal vein, which were the result of dehydration and malnutrition.

Linda Clayton and Carolyn Clayton
Linda and Carolyn, sisters of the defendant, both testified on behalf of Bessie Marie Clayton. Both stated that Bessie Marie did not work and that they all received aid from the government in the form of food stamps and Medicaid.
Linda stated that she, her sister, their kids, and her grandmother, Bessie W. Clayton, lived out in the trailer on Highway 30.[4] While Linda stated that Bessie Marie lived with her children in a home on Lamar, she also stated that Bessie Marie lived in C.B. Webb and "sometimes" lived there in the trailer; Bessie Marie was there on January 17, 1989, with Anginetta when Linda left for work. Linda testified that Bessie Marie was with Anginetta when she was hospitalized, she never saw her sister mistreat Anginetta and that her grandmother and Carolyn provided care to Anginetta. Linda also testified that she did not let two Welfare Department workers into the trailer when they came to check the home.
*724 Carolyn also testified that Bessie Marie lived in her own place but did spend time at the trailer as well. Carolyn in her testimony recalled that the day the baby died, Bessie was in court and Anginetta and Bessie W. Clayton were at the trailer. Carolyn stated that after they noticed that something was wrong with the baby, she went to the courthouse to get Bessie. When they returned to the trailer, Anginetta was dead. Carolyn also testified that she never witnessed Bessie mistreat Anginetta, that Bessie took the baby to the hospital several times and that the baby required different care because she was retarded.

DISCUSSION OF THE LAW

WHETHER THE EVIDENCE IS SUFFICIENT TO SUPPORT THE VERDICT OF GUILTY?

Standard of Review
This assignment of error turns on the familiar standard concerning sufficiency of evidence. This Court in considering a motion for directed verdict has stated that:
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence  not just that supporting the case for the prosecution  in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is beyond our authority to disturb.
Pate v. State, 557 So.2d 1183, 1184 (Miss. 1990), citing McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987); Wells v. State, 521 So.2d 1274, 1277-78 (Miss. 1987). As the testimony summarized above illustrates, the evidence was very close for the jury's consideration.
In the case sub judice, Appellant was indicted pursuant to § 97-3-19 of Mississippi Code Annotated which reads:
§ 97-3-19. Homicide; murder defined; capital murder
The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;
Miss. Code Ann. § 97-3-19(1)(b) (Supp. 1992).
This case must be reversed. The defendant here is convicted of murder under § 97-3-19 for failure to properly feed and care for her child. In effect, she is found to have neglected Anginetta Clayton to such an extent as to have caused her death. Yet the record is replete with hospital visits, doctors' office visits and a spasmodic, yet continuous, effort by the defendant to find help for the child and to deal with her numerous health problems. We must be reluctant to hold the defendant to a standard of health care for Anginetta that rises above her ability. The defendant managed her normal children in such a way that they survived and matured normally. She could not cope with the health of Anginetta and the health community, though involved and informed, did not cope with the situation as it existed. Surely, at the very best, we should remand this case so that another jury may pass upon the charge and the evidence. Dr. Joe Harris, a private practitioner, in the field of pediatrics testified that:
[W]e don't know what caused her problem at birth, but from birth she did have  if you want to call them birth defects, that's fine; but she had some problems. She had had microcephaly, which is a small head; and the reason she had a small head is because she had a small brain. That sounds facitious (sic), but that's what happens. *725 If your brain doesn't grow, your head doesn't grow.
Anginetta's brain did not grow. We don't know why. We can assume it was a poor blood supply to the brain, but we'll never know. She was sent to LeBonheur. They examined her; and again, as I said, she may have had congenital infection. She may have had malformation to a blood vessel to the brain that prevented the brain from growing, therefore a small head.
She didn't develop normally like a normal child would be expected to develop and grow and thrive. She just didn't do that. Again, that was part of her, if you will, birth defects.
The nerves to all her body, her arms and legs were affected, and she had a problem with development growth of her limbs. They were what we call spastic, very stiff. When you see Anginetta try to move her arms, she couldn't move them; but, again, you felt a lot of resistance because of her congenital problems.
She had developed seizures; and this, again, is probably from her congenital problem. So she was on medication for her seizures.
She required special care if you want to call it that, because she didn't grow and develop like you would expect a normal child to do. She couldn't sit up. She couldn't really do a whole lot of anything. Her mother had to take [sic] care of her all the time. She required pretty much constant care.
Feedings were difficult too. The child couldn't take normal feedings and couldn't be fed like a child her age should be fed or feed herself. She had to be fed and cared for constantly, if you will.
She never developed past a three or four months' age level as far as she had developed and as far as she was ever going to develop... .
First of all, you probably couldn't get enough nutrients in her to let her grow as a normal child would without special type of feeding, tube feedings and that type thing; but you would expect her to show a continued growth pattern. There would be peaks and valleys, yes; but your usual trend would have been upward.
This testimony suggests the difficulty in caring for the child. We must be careful not to require of the mother a standard of care that even the professional medical community found difficult. Dr. Harris speaks of examination by Le Bonheur (a children's hospital in Memphis, Tennessee) but he did not institutionalize the child. Dr. Harris testifies to growth and upward growth trends but this growth is obtained by "special type of feeding, tube feeding and that type thing." To make this a failure under § 97-3-19 there must be evidence of the defendant's knowledge and ability to give this type of care. Dr. Harris testified further that this pitiful victim of neglect, by both her mother and our society, should have been placed in some medical facility. In part he stated:
That was part of our reason for referral to a neurologist to see if her condition warranted that. I think Anginetta could have benefitted from that [hospitalization], yes... .
She was seen by the mental complex center here, and they said it was no place for a child that age in that facility. As far as I know, there is no other place.
Anginetta had no place to go though she had the desperate need. The mother, who surely failed her in large part, could not give the requisite care in this unusual situation. We should not place the total blame on an ignorant and unknowing mother. The record reveals that the defendant/mother took Anginetta on more than a dozen occasions to health facilities seeking help but help was not to be found. Advice and medicine seemed to be available but attention to Anginetta's special needs was not available. We should not hold the defendant to a standard of care that she could not give and a standard of care that even professionals only talked about but could not give permanently and a standard of care that was not available to the defendant even through charitable or government agencies.
We therefore follow the decision set forth in Mister v. State, 190 So.2d 869 (Miss. 1966), *726 wherein this Court, in reversing and remanding a case for a second jury trial, stated:
The State's case was sufficient to survive defendant's request for a peremptory instruction, but under all the circumstances, the verdict is against the great weight of the evidence. The motion for a new trial should have been sustained. Since the evidence of defendant's guilt is of such nature as to create a serious doubt in our minds, we think that another jury should be permitted to pass upon the question. Cole v. State, 217 Miss. 779, 65 So.2d 262 (1953); Dickerson v. State, 54 So.2d 925 (Miss. 1951); Jefferson v. State, 52 So.2d 925 (Miss. 1951); Conway v. State, 177 Miss. 461, 171 So. 16 (1936).

Lyle v. State, 193 Miss. 102, 8 So.2d 459 (1942), is an illustrative arson case on the sufficiency of the evidence. The conviction in the trial court was based upon the uncorroborated testimony of an accomplice, and the Court held that where such testimony is improbable, unreasonable, and self-contradictory, it should not be upheld.
Mister v. State, 190 So.2d at 871.
This Court in Hux v. State, reaffirmed the law set forth in Mister v. State: "In our opinion, the state's case was sufficient to survive defendant's request for a peremptory instruction, but as stated in Quarles v. State, 199 So.2d 58 (Miss. 1967), and Mister v. State, 190 So.2d at 869, the defendant's guilt is in such a state of serious doubt that this Court believes that another jury should pass upon the matter." Hux, 234 So.2d 50, 51 (Miss. 1970).
Finally, as this case necessitates reversal, we decline to address the issue of photographs. However, we do choose to address certain jury instructions given at the trial of the case sub judice, as such a discussion could perhaps prevent the same error from reoccurring.
The trial court properly gave instructions allowing the jury to find Clayton guilty of manslaughter rather than murder. It also refused a lesser included instruction of neglect. The problem arises in the definitional instruction. There the court told the jury that the difference between "depraved heart" murder and "culpable negligence" manslaughter was that the former requires that the defendant's acts be "willful". The court then instructed the jury that "culpable negligence" was such reckless behavior as to be the "equivalent to willfulness." That the jury was confused is evidenced by the fact that it requested further instructions on those terms. The court declined to give further instructions.
While it is true that "culpable negligence" has been deemed sufficient to supply the element of willfulness thought necessary to a criminal act, Evans v. State, 562 So.2d 91 (Miss. 1990); Smith v. State, 197 Miss. 802, 20 So.2d 701 (1945), defining the term as such is hopelessly confusing in the context of this case.
To the extent that we hold on to the notion that depraved heart murder and culpable negligence manslaughter can co-exist given the broad interpretation of depraved heart murder adopted by this Court, See Mallett v. State, 606 So.2d 1092 (Miss. 1992); Windham v. State, 602 So.2d 798 (Miss. 1992), instructions such as that given in the instant case defining culpable negligence are to be avoided. In Hurns v. State, 616 So.2d 313, 320 (Miss. 1993), we considered jury instructions for both depraved heart murder and culpable negligence manslaughter. We stated that the more appropriate definition of culpable negligence is "negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life." Hurns, 616 So.2d 313, 320 (Miss. 1993). Where the objective is to distinguish culpable negligence manslaughter from depraved heart murder the definition of culpable negligence should be limited to the definition given by this Court in Hurns.[5]
REVERSED AND REMANDED.
DAN M. LEE and PRATHER, P.JJ., and McRAE, J., concur.
*727 BANKS, J., concurs in part.
HAWKINS, C.J., concurs in part and dissents in part with separate written opinion joined by SULLIVAN and BANKS, JJ.
SMITH, J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
HAWKINS, Chief Justice, concurring in part and dissenting in part:
I concur in reversing this case, but would reverse and render insofar as Clayton is charged with murder under Miss. Code Ann. § 97-3-19(1)(b) (Supp. 1992). If she actually intended to kill her child, then she is guilty of murder under Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1992). If not, then it is a distortion of language, logic and common sense to argue she is guilty under Miss. Code Ann. § 97-3-19(1)(b).[1] How, some may ask, was Clayton's treatment, or neglect, of her baby Anginetta "eminently dangerous to others?"
We started down this road in Johnson v. State, 475 So.2d 1136 (Miss. 1985), and Fairman v. State, 513 So.2d 910 (Miss. 1987), and its incongruity was pointed out in special concurring opinions of my own and Justice Banks in Windham v. State, 602 So.2d 798, 804-808 (Miss. 1992); further elaborated on by Justice Lee in a dissenting opinion in Mallett v. State, 606 So.2d 1092, 1096 (Miss. 1992); and reiterated by Justice Banks in a concurring opinion in Hurns v. State, 616 So.2d 313, 322 (Miss. 1993).
As I explained in Windham v. State, 602 So.2d at 804, classic examples of violation of Miss. Code Ann. § 97-3-19(1)(b) are shooting into an occupied building, or putting a bomb in a building or car.[2]
I also disagree with the majority that a manslaughter instruction cannot be a proper instruction under the facts of this case. Indeed, in my view, unless the State has evidence that she was guilty of deliberately intending to kill her daughter, she may very well be guilty of manslaughter under Miss. Code Ann. § 97-3-47 (1972): "Every other killing of a human being by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter."
We have done exceeding mischief to established legal concepts and principles in attempting to fit the square pegs of the facts in Windham, et al.  and as we again do in this case  in the round hole of Miss. Code Ann. § 97-3-19(b). This case affords one very good opportunity to correct the matter, and I would overrule Johnson, Fairman, Windham and Mallett, insofar as they hold that in facts such as presented in this case there can be a violation of Miss. Code Ann. § 97-3-19(b).
Judges, above all others, have a solemn duty to prevent words or grammar from being stretched or yanked from their usual and accepted meanings and usage.
SULLIVAN and BANKS, JJ., join this opinion.
SMITH, Justice, dissenting:
The majority would have us address this case by basically placing partial blame upon society for its failure to provide facilities to adequately care for Anginetta Clayton, and absolve Bessie Marie Clayton from her responsibility as the child's mother, by proclamation that Clayton is "an ignorant and unknowing mother, incapable of giving the requisite care in this unusual situation." The fact that society could not adequately provide care for a child of this age does not relieve Clayton, the natural mother, of her responsibility as a parent, much less relieve her of accountability for her actions or inaction.
The majority has correctly categorized this case as one involving a defendant/mother who made more than a dozen unsuccessful *728 attempts to place her pitiful, severely retarded, and diseased child, Anginetta, with various health facilities. No one could dispute that the desperate and special needs of this child should have required institutionalization. The fact remains, no such institution was available either through charitable or governmental agencies. These facts alone make this case both disturbing and disheartening for this Court to consider.
This is a case where our feelings and emotions concerning the aforementioned matters relating to both Clayton and her child, Anginetta, might influence the outcome if we so allowed. However, we must cast aside personal feelings and emotions. This case must be decided on one factor alone, that factor being the cause of this child's death whether from pre-existing disease or malnutrition and starvation caused by omissions of Clayton.
While there could be some question about the extent of the child's pre-existing conditions and how, if at all, those conditions affected the cause of death, it is uncontradicted that in the final analysis, the ultimate cause of Anginetta's death was malnutrition. Although the expert physicians did comment on the child's abnormal state, each ultimately testified that this child died solely as a result of malnutrition and dehydration and not as a result of any pre-existing conditions.
Because of the experts' findings as to the cause of death and the fact that the jury was properly instructed regarding depraved heart murder and the lesser included offense of manslaughter as well, I disagree with the majority's conclusion and would affirm Clayton's conviction.
Let us first examine the experts' testimony relating to cause of death. Dr. Joe Harris testified that he had seen and treated Anginetta Clayton on several occasions. He detailed for the jury the child's pre-existing medical conditions. While Harris agreed that feeding Anginetta was a difficult task and that the child was unable to be institutionalized until she reached two years of age, he stated that notwithstanding the child's medical complications and problems, the child should have demonstrated "an upward trend in her growth pattern." Dr. Harris told the jury that although the child could not feed herself, with proper care and feeding her weight would increase. Contrary to the majority's claim of Clayton's lack of knowledge, Dr. Harris stated that Clayton was instructed about administering medications and on how to care for her child. Specifically, the doctor testified that at discharge, a nurse reviews special procedures and treatments regarding a patient's care, including how to give medications.
Significantly, without objection, hospital forms bearing Clayton's signature were identified and introduced on direct examination of Dr. Harris which supported the doctor's testimony. Dr. Harris testified:
Q. Can you describe for the jury what those are that you have in your hand?
A. These are the forms that the nurse fills out when she discharges the patient. Again it describes any medications, what activities patients may or may not do, the type of diet the patient should be on, and any type of follow up care like followup appointment with either myself or another physician
Q. And are those customarily signed by the person in whose care the patient is released?
A. Yes.
Q. Is the name Bessie Clayton on those forms?
A. Yes.
Dr. Harris further stated that the child's condition and ailments warranted placing the child in a medical facility for constant care, but that there was no facility that would take a child of such young age. Dr. Harris also testified that "[t]he weight of 9.94 pounds at the time of death was abnormal." When asked why, Dr. Harris stated that "the main reason that somebody doesn't gain weight is because they don't eat." Dr. Harris was asked if the child could feed herself and he replied, "No". Dr. Harris warned Clayton that "if Anginetta was not given her medication and taken proper care of, she could die." (emphasis added). Dr. Harris opined:
The precipitous drop we see in her weight shortly before death and the autopsy report, showing renal vein thrombosis, and *729 severe inanition or severe malnutrition doesn't reflect her disease process. Her disease doesn't cause that. With proper care she still would have grown somewhat, but she didn't. She lost weight. (emphasis added).
Most important in Dr. Harris' testimony was his conclusion that the child's cause of death "being severe inanition and malnutrition" was not reflective of her disease process. Dr. Harris, in response to the district attorney's question of whether the dehydration/malnutrition process would be painful, stated: "Sure. The sever (sic) dehydration, she would be thirsty, extremely thirsty. Malnutrition, she would be hungry."
Dr. Brooks Allison, a pathologist, testified regarding the child's medical conditions and cause of death. Dr. Allison stated, "the immediate cause of death was due to the blood clots in the veins that drain the kidneys; but that was, the blood clots were caused by the severe malnutrition and dehydration that this patient had." Refering to the skin and how it illustrated the cause of death, Dr. Allison described the total lack of moisture in the child's skin:
In this case with severe dehydration, the blood is so severely concentrated that it's thick and syrupy that it is easy for it to clot, so naturally it clots. The kidneys then no longer have the ability to concentrate or purify the blood. That compounds the problem and the baby dies a metabolic death. Their heart stops.
Dr. Allison stated further that "in my opinion, the loss of weight didn't have anything to do with the problems of seizure disorder, fever and retardation." Dr. Allison testified that the baby lost 36% of her body weight in four months time. He further opined that fluid deprivation can kill a baby in a few days. Dr. Allison also stated that the child ultimately died as a result of malnutrition and dehydration. He felt that the dried out fecal material was consistent with severe dehydration. Additionally, he stated that:
Only two things cause renal vein thrombosis. One is diabetes mellitus. This baby didn't have it. The other is severe dehydration.
Dr. Allison opined that this child would not have died if given proper care and nutrition. He further stated that there would be no way for anyone to be around this child from September 1988 until January 1989 and not know what was going on. Dr. Allison did state that "there would have to be medical care and close supervision from the parents."
While there may be some question about the extent of the child's pre-existing conditions and how those conditions affected the ultimate cause of death, there does not appear to be any conflict over the fact that Anginetta died as a result of malnutrition and dehydration.
There was evidence elicited that the child was not given the proper medication. Regarding a bottle of Dilantin, prescribed for the child and located at the trailer where the body was found, Buddy Roy, Lafayette County Medical Examiner testified that:
The bottle ... was prescribed for a total of 240 cc of Dilantin. It was approximately 12 cc's of medication removed from the bottle, and on the prescription I noticed that the medication was to be given a dosage of 4 cc's three times per day. The child's death occurred on January 17, 1989. The total usage from the bottle should have been approximately 120 cc's of Dilantin under normal usage... . It was approximately 12 cc's only used from the bottle.
Roy further testified that, "he noticed the clothes" and "the child's body" were "very dirty." The "weight of the child was 9.94 pounds." Her skin was "leathery," with no elasticity to it at all and no moisture in the skin. Furthermore, the child's anal canal was dilated "with dried hard feces due to constipation...."
Additionally, there was testimony at trial as to lack of food and the generally deplorable conditions in the trailer where the child lived along with other siblings. Buddy East, Sheriff of Lafayette County, testified that he knew that Clayton had other children and that the Welfare Department "had been working with Ms. Clayton about her children... ." He called the Welfare Department and all of the children were taken into custody, by virtue of a court order, on the *730 night of January 17, 1989. East testified that the trailer was "dirty, nasty, filthy; and we took the children at that time into custody and turned them over to the Welfare Department." East stated that he "didn't see any food in the home and that it wasn't fit for a dog to live in." (emphasis added). Sheriff East recovered the bottle of Dilantin that had been prescribed for Anginetta and informed Clayton that he was going to charge her "if this baby died from malnutrition or died from not being properly cared for." However, in fairness, Sheriff East also told Clayton that, "If it died from natural causes, then you don't have anything to worry about. I'm not threatening you. I want to be honest and straight up with you."
The majority implies that the care and feeding process for this baby was extremely difficult, especially for someone like Clayton, "an ignorant and unknowing mother." The record does not entirely support such a statement. Clayton's only evidence was provided by her two sisters. Carolyn Clayton testified that the baby did not eat solid food, only baby food. Yet, she testified that there were four (4) adults in the household, all of whom knew how to care for and did feed Anginetta. On cross-examination, Carolyn was questioned:
Q. If all of you are involved in her care, how did you know when to feed the baby?
A. I knew when to feed her. I knew when to feed mines.
Q. Are yours handicapped?
A. No.
Q. So that's different, isn't it?
A. No. You have to feed any child.
The feeding of Anginetta, although more time consuming and somewhat difficult, was not impossible, as clearly indicated by the testimony of her own sister, Carolyn Clayton. The bottom line on this subject as the evidence reflects appears to be a lack of adequate attention and supervision on Clayton's part. As Dr. Allison put it, the baby would not have died if given proper care and nutrition, and, as he further opined, there would be no way to be around this child during the four months prior to Anginetta's death and not know what was going on.
Clayton's lack of adequate supervision and care for her child is best described by her two sisters and Clayton herself. Clayton testified that at times she lived in the trailer with her two sisters and mother, but sometimes lived in a home off of South Lamar Street. Her sister Linda Clayton testified that Clayton sometimes lived with C.B. Webb and sometimes lived there in the trailer. Linda also told the jury that she had refused to allow welfare workers inside the trailer to check on the baby on two occasions. Both sisters stated that Clayton did not work and that they all received government aid consisting of medicaid and food stamps. Clayton apparently had time to deal dope and get herself convicted and sentenced to 12 years for possession with intent.
Clayton's assignment of error turns on the standard concerning sufficiency of evidence. The testimony in the case sub judice is more than sufficient for the jury to return a verdict of guilty. However, as part of her sufficiency argument, Clayton claims that the depraved heart murder statute is couched in terms of "committing an act," and that some act, by the wording of the statute, must be committed that is imminently dangerous to others and evincing a depraved heart, regardless of human life. Clayton argues that the act committed by her was "one of omission, not an act contemplated by the depraved heart statute." The majority readily accepts Clayton's argument. The majority's reasoning is misplaced.
Clayton admits an "omission" on her part. She also states that "[t]he conviction rests on the mother's failure to provide the child adequate nutrition." Clayton claims that this is analogous to "not feeding the child enough, of not giving the child enough water," and that there is nothing eminently dangerous about this act. Nothing could be further from the truth. Both Clayton and the majority maintain that this case is one involving no criminal agency causing death.
Clayton's actions actually constituted "wilful non-action" by and through her failure to feed, nourish and give proper medication to her child. She is absolutely responsible and *731 must be held accountable. There was more than sufficient evidence of wilful neglect of Anginetta by Clayton evidencing a depraved indifference to human life, thereby causing this child's death. There exists evidence of failure to give sufficient medication; dirty, filthy conditions of the child herself; drastic loss of body weight in a short period of time; dirty, filthy clothing; general conditions of the premises described as nasty, filthy, dirty "and unfit for a dog"; no food; and a condition of constipation so deplorable as to exhibit a complete lack of attendance to this child by its mother. The jury obviously was concerned by these factors, as well as the "flighty" goings and comings of Clayton from various places of apparent residence.
Clearly, Clayton wilfully neglected Anginetta to the point of ultimately allowing malnutrition and dehydration to claim her child's life. In fact, she totally disregarded the doctor's ominous warning that Anginetta could die if she failed to follow certain simple precautions which clearly had been explained to Clayton by hospital personnel.
This is a case of first impression as this Court has never addressed whether the "non-action" or "omission" to feed and nourish one's child falls within the confines of the depraved heart murder statute. It is therefore helpful to examine case law from other jurisdictions for guidance.
Mississippi's depraved heart murder statute does not require a deliberate intention to cause death. In fact, it specifically excepts this requirement from the statutory scheme. The sole issue therefore is whether Clayton's conduct in the failure to feed and nourish her child amounts to an "act eminently dangerous... ." Clayton alleges that her "omissions" amounted to mere neglect and cannot be murder. Clayton's argument notwithstanding, there is case law to the contrary.
In State v. Crocker, 435 A.2d 58 (Me. 1981), the Supreme Court of Maine, faced with interpretation of their "depraved indifference" murder statute, analyzed and compared both civil and criminal culpability for the starvation of a child and for head injuries sustained by the child. That court held in part:
[T]he jury could have found that defendant lifted the five-year-old Timothy by the feet, swung him around over his head, and then let the boy go head first into a wall, thereafter leaving him to lie on a mattress for several days, unconscious and without medical or any other kind of attention. Alternatively or additionally, the jury could have believed that for a significant time defendant withheld food from Timothy. They could have found that either course of conduct resulted in the child's death. Either alone was sufficient to permit the jury to conclude that defendant, in causing Timothy's death, had engaged in savage and brutal conduct, objectively manifesting a depraved indifference to the value of human life.
Crocker, 435 A.2d at 67.
The Supreme Court of Georgia has analyzed this issue also. In Lewis v. State, 255 Ga. 101, 335 S.E.2d 560 (1985), the court determined that sufficient evidence existed to support the conviction and thus upheld a malice murder conviction of a mother where her tenth-month-old baby died of pneumonia secondary to malnutrition. The Georgia court also analyzed a felony murder conviction of a mother who caused the death of her seven-week-old baby by starvation/malnutrition. While the case was reversed for a procedural violation concerning peremptory strikes, the court did comment on the sufficiency of evidence stating: "we find that it was sufficient to authorize a rational trier of fact to find every element of guilt beyond a reasonable doubt." Joyner v. State, 251 Ga. 84, 303 S.E.2d 106, 107 (1983).
The Supreme Court of Utah in State v. Nicholson, 585 P.2d 60 (Utah 1978), in a case very analogous to the case sub judice, upheld a mother's second-degree murder conviction for the starvation/dehydration of her 19-month-old son. The defendant on appeal suggested that she was "simply negligent, or careless or reckless so that the evidence was insufficient to show `depraved indifference'". Id. at 62. The court held that the defendant's conduct comported with the statute as "[a]cting under circumstances evidencing a depraved indifference to human life, he recklessly engaged in conduct which creates a *732 grave risk of death to another and thereby causes the death of another... ." Id. at 62-63.
The majority states simply that "the evidence was very close for the jury's consideration." Hence, the majority maintains that this case must be reversed and remanded for another jury to take another look. I am of the opinion that the majority is simply ducking the issue without addressing the state of the law or lack thereof in this case. Unfortunately, we shall most likely face the same situation again if we allow the majority to prevail. Therefore, at the very least it would be more practical to deal with this issue now, clarifying the statute's applicability as it relates to the facts of this case.
The cases from other jurisdictions support the proposition that depriving a helpless child of food and water, unquestionably necessary to sustain life, can be an "act eminently dangerous" to that child and "evincing a depraved heart, regardless of human life." In the case sub judice, there was more than sufficient evidence presented to support the jury's verdict of guilty of murder. Additionally, the jury was instructed on the lesser included offense of manslaughter, but rejected that possible verdict. I suggest that this Court interpret our depraved heart murder statute as other jurisdictions have and forthwith affirm Clayton's conviction.
I respectfully dissent.
JAMES L. ROBERTS, Jr., J., joins this opinion.
NOTES
[1] The defense objected to the court's refusal of their gross neglect instruction and the court's granting the State a lesser-included offense/manslaughter instruction.
[2] The sentence previously imposed was for a period of twelve (12) years and resulted from defendant's conviction for possession of a controlled substance with intent to distribute.
[3] Harris testified that none of the treating physicians were able to precisely determine Anginetta's condition.
[4] Linda had two children, Carolyn had three children, and Bessie had five children.
[5] In Hurns, we erroneously attributed this language to the statute. The definition is derived from case law. See Sullivan v. State, 213 Miss. 14, 56 So.2d 93 (1952); Smith v. State, 197 Miss. 802, 20 So.2d 701 (1945).
[1] § 97-3-19 Homicide  murder defined.

... .
(a) When done with a deliberate design to effect the death of the person killed, or of any human being.
(b) When done in the commission of an act eminently dangerous to others, and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.
[2] Had the man who recently discharged an automatic weapon into the White House killed an occupant, this would have been a classic example of violation of Miss. Code Ann. § 97-3-19(1)(b).