Submitted March 10, 2020, resubmitted en banc June 9, 2021; affirmed by an equally divided court (ORS 2.570(5)) April 13; petition for review denied September 16, 2022 (370 Or 214)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DNAY A. LOCKHART,
*Defendant-Appellant.*

Hood River County Circuit Court
16CR05520, 17CR25167;
A167926 (Control), A167927

508 P3d 526

Defendant was found guilty of, among other things, first-degree sodomy, ORS 163.405, and first-degree sexual abuse, ORS 163.427. On appeal, defendant argues that the evidence was legally insufficient to permit the jury to find that the victim was subject to forcible compulsion, an element of both offenses, and that the court therefore should have granted a motion for judgment of acquittal on the charges. *Held*: The Court of Appeals, sitting en banc, affirmed by an equally divided court, with concurring opinions by DeVore, S. J., and Mooney, J., and dissenting opinions by James, J., and Lagesen, C. J.

Affirmed by an equally divided court. ORS 2.570(5).

En Banc

Karen Ostrye, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Shawn Wiley, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before Lagesen, C. J., and Ortega, Egan, Tookey, Shorr, James, Aoyagi, Powers, Mooney, Kamins, JJ., DeVore, S. J., and DeHoog, J. pro tempore.

PER CURIAM

Affirmed by an equally divided court. ORS 2.570(5).

DeVore, S. J., filed a concurrence in which Tookey, Shorr, and Powers, JJ., and DeHoog, J. pro tempore., joined.

Mooney, J., filed a concurrence in which DeVore, S. J., joined.

James, J., filed a dissent in which Ortega, Egan, Aoyagi, and Kamins, JJ., joined.

Lagesen, C. J., filed a dissent in which Ortega and Kamins, JJ., joined.

**DeVORE, S. J.,** concurring.

Defendant appeals from the judgment of conviction on Count 1, first-degree sodomy, ORS 163.405, and Count 2, first-degree sexual abuse, ORS 163.427, but does not challenge the convictions on Count 3, third-degree sexual abuse, ORS 163.415, and Count 4, contributing to the sexual delinquency of a minor, ORS 163.425. Defendant argues that the evidence was insufficient to permit the jury to find an act of forcible compulsion that is necessary for the first-degree offenses of Counts 1 and 2. Together with colleagues who join this opinion, I conclude that the trial court did not err in denying defendant's motions for judgment of acquittal on Counts 1 and 2.

An appellate court is required to "view the evidence in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt." *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). The court accepts all "reasonable inferences and reasonable credibility choices" that the jury could have made. *State v. Walters*, 311 Or 80, 82-83, 804 P2d 1164, *cert den*, 501 US 1209 (1991). Those standards dictate how, after a verdict, this court regards two differing versions of the facts.

FACTS

Before trial began, the trial court directed the parties, as a matter of respect and dignity, to refer to defendant as Ms. Lockhart, by full name, or simply as defendant. In opening statement, defense counsel advised the jury that defendant is transgender, explaining, "She was born male, but she identifies as female." When introducing a defense of consensual contact without force, defense counsel said, "She presents very feminine."

On April 22, 2015, K, the complaining witness, was 16 years old and a few days short of his next birthday. He was between five feet one and five feet two inches tall, weighing between 120-130 pounds. Because he was home-schooled, he spent Wednesdays at the city library for internet access on his computer for online classes. At that time, defendant was

28 years old, five feet eight inches tall and weighed about 150 pounds. At trial, K agreed that defendant was bigger and weighed more, but he did not know that defendant was 11 to 12 years older.

K testified that he met defendant in the children's section of the library. Defendant testified that, being "taken" with K's red hair and piercings, defendant "struck up" a conversation with K. K recalled that they talked about the piercings, skateboarding, and school. K testified that he thought defendant was very attractive and that defendant was "female" due to "long hair" and "body shape." K testified that they were flirting. K testified that defendant did not say anything about defendant being gay or transgender.[1]

K testified that, after talking, variously estimated at 10 or 30 minutes, defendant asked K to follow defendant. K testified that he followed but did not know where they were going. K thought it was "really weird" but followed defendant into the men's restroom. K testified that he did not know what was going to happen and that he was "just curious." K testified that he was attracted to defendant and that he wanted to kiss defendant. K testified that he followed because defendant asked. He testified that he did not feel coerced, and he repeated that he thought defendant was female.

Defendant and K went into the larger, handicapped stall. K testified that defendant grabbed the door and shut it. Defendant testified that she "locked" the hasp on the door. On cross-examination, K agreed that he could have walked out at any time, but K also testified that defendant was blocking the door to get out—because defendant was standing in front of the door.

K testified that, after defendant closed the door, defendant "pushed [K] down." On direct examination, K testified:

> "Q.   Okay. When you say [defendant] pushed you down, how—*describe exactly* how that happened for the jury.

---

[1] K testified that defendant said something about "new world order," but that K did not know what that meant. Defendant testified she mentioned being a "new age woman," a term she uses to "explain transgenders for men."

"A.    *Pushed me down on the shoulders, pushed me onto the ground on my knees.*

"Q.    Onto your knees?

"A.    Yes.

"Q.    And the defendant was standing?

"A.    Yeah.

"* * * * *

"Q.    Was the defendant clothed or unclothed?

"A.    No pants on.

"Q.    Okay. And when the defendant took the defendant's pants off, what did you see?

"A.    I saw a penis.

"Q.    And what did the defendant do when you were pushed down on your knees?

"A.    He *made me* give him oral sex.

"Q.    Where did the penis—where did the defendant's penis go?

"A.    In my mouth.

"* * * * *

"Q.    Is this something you wanted to do?

"A.    *No.*

"Q.    * * * [W]hy did you not just leave the stall?

"A.    I (indiscernible)—I froze.

"* * * * *

"Q.    Okay. And do you recall if the defendant ejaculated?

"A.    Yes."

(Emphases added.) On cross-examination, K testified consistently, with some added detail:

"Q.    Okay. Shut it [stall door]. And then what happened?

"A.    [*Defendant*] *pushed me down on my knees.*

"Q.    I'm sorry.

"A.   [Defendant] pushed me down from my shoulder and *put me on my knees*.

"Q.   Now, when you say pushed you down on your shoulder, one hand or two hands?

"A.   One hand.

"Q.   Which shoulder?

"A.   I think it was my right one.

"Q.   Right shoulder?

"A.   Yeah.

"Q.   Where on the ground?

"A.   *All the way to the ground* onto my knees.

"Q.   Pushing you down onto your knees? Okay. Then what happened?

"A.   [Defendant] took [defendant's] pants off.

"* * * * *

"Q.   How was she able to take her pants off while she's *holding you down*?

"A.   *With her other hand*, (indiscernible) her pants.

"* * * * *

"Q.   At this point did you know she was female—male, I mean?

"A.   No.

"Q.   So at this point you're still voluntarily doing this otherwise?

"A.   *No*, I didn't know what to do.

"* * * * *

"A.   They were sweatpants, (indiscernible).

"Q.   And at this point though, until you see her actual male genitalia, you did not know she was male, right?

"A.   Yes.

"Q.   Okay. So up to the point where you understood that she was female, were you [] a willing participant in this?

  "A. *When I was pushed down, I wasn't.*

  "Q. But what—did you resist in any way?

  "A. I froze.

  "Q. And you were pushed down to your knees.

  "A. *Yes.*

  "Q. And then she presented to you as a male, male genitalia; is that correct?

  "A. Yes

  "Q. Erect?

  "A. Yeah."

(Emphases added.) On cross-examination, K was questioned closely about his response. K testified:

  "Q. So you—why didn't you get up?

  "A. Froze.

  "Q. What happened then?

  "A. Didn't know what to do.

  "Q. What happened then?

  "A. *[Defendant] put [defendant's] penis in my mouth.*

  "Q. How did she put her penis in your mouth? Was your mouth open or was it shut?

  "A. *It was shut.*

  "Q. So how did she force her penis into your mouth?

  "A. I didn't know what to do.

  "Q. How did she force her penis into your mouth?

  "A. *I'm telling you I didn't know what to do, and—*

  "Q. How did she force her penis into your mouth?

  "A. *My mouth opened.*

  "Q. Did you not have the ability to keep your mouth closed at that point?

  "A. It [*sic*] did but not mentally.

  "Q. Physically though?

"A.   I couldn't bring myself to do anything.

"Q.   So what did you do?

"A.   I let [defendant] do it."

(Emphases added.) K testified that oral sex lasted about two minutes. When asked how the encounter ended, K testified "as fast as possible." He testified that he had no further conversation with defendant and that he did not kiss defendant.

Defendant testified to a consensual encounter. On direct examination, defendant testified that, upon entering the stall, there was touching and fondling. Defendant testified that defendant pulled defendant's pants down and she put her hand up to K's face "in a very endearing sort of way." Defendant testified, "I was like, 'Come on,' and [K] did his thing." Asked how long K performed oral sex, defendant described it as a "15 or 20-minute journey." Defendant testified that, as someone entered the restroom, defendant and K left, giggling; that they both went to a library meeting room to talk for about 10 minutes; that defendant was exhilarated, saying "this was my journey of freedom with my spirit," and "that was fun." Defendant testified that they hugged before K left.

The jury was instructed on the four charges alleged, which included first degree sodomy, involving subjecting another to forcible compulsion and oral sexual intercourse, and first-degree sexual abuse, involving forcible compulsion and sexual contact. The instructions included the statutory definition of forcible compulsion.[2] The jury found defendant guilty on all four counts.

## LAW

Like the jury, I must begin with a description of the offenses at issue. A person commits first-degree sodomy when, among other things, a person "engages in oral *** sexual intercourse with another person" and "[t]he victim is subjected to forcible compulsion by the actor." ORS

---

[2] The jury was also instructed that a person is not capable of consenting to a sexual act if that person is under 18 years of age; and that a lack of verbal or physical resistance does not, by itself, constitute consent but may be considered along with all other relevant evidence.

163.405(1)(a).[3] A person commits first-degree sexual abuse when, among other things, a person "[s]ubjects another person to sexual contact" and "[t]he victim is subjected to forcible compulsion by the actor." ORS 163.427(1)(a)(B).[4] Oregon statute explains that "'[s]exual contact' means any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(5). As applicable here, "'[f]orcible compulsion' means to compel by *** [p]hysical force." ORS 163.305(1)(a). Until 1999, forcible compulsion had been defined to be "[p]hysical force *that overcomes earnest resistance*." ORS 163.305(1)(a) (1997) (emphasis added). The language requiring evidence of "overcoming earnest resistance" was repealed. Or Laws 1999, ch 949, § 1. This court explained, "The 'earnest resistance' requirement was removed due to its deleterious effects on victims of sexual assault." *State v. Beckner*, 303 Or App 744, 752 n 6, 466 P3d 1000, *rev den*, 366 Or 826 (2020).

Today, our understanding of those statutory terms is provided by *State v. Marshall*, 350 Or 208, 253 P3d 1017 (2011). That case involved a defendant's challenge to the denial of his motion for judgment of acquittal on two charges of first-degree sexual abuse. The defendant was a family friend, age 27, and the victim was age 14. *Marshall*, 350 Or at 212. One morning, the victim awakened to find the defendant partially on top of her. The defendant "grabbed" the

---

[3] In relevant part, ORS 163.405 currently provides:

"(1)  A person who engages in oral or anal sexual intercourse with another person or causes another to engage in oral or anal sexual intercourse commits the crime of sodomy in the first degree if:

"(a)  The victim is subjected to forcible compulsion by the actor[.]"

In 2017, ORS 163.405 was amended, Or Laws 2017, ch 318, § 5, but, because the amendment does not affect the analysis, reference here is to the current statute. *See* Or Laws 2021, ch 82, § 5.

[4] In relevant part, ORS 163.427 provides:

"(1)  A person commits the crime of sexual abuse in the first degree when that person:

"(a)  Subjects another person to sexual contact and:

"*****

"(B)  The victim is subjected to forcible compulsion by the actor[.]"

victim's hand and "forced" her hand down the front of his pants, placing it on his penis. *Id*. After she turned away, defendant slipped his hand down the back of her sweatpants and put his hand on her buttocks. Those acts presented two legal issues on appeal. The first issue was whether "forcible compulsion" must in some sense cause or result in the sexual contact, and the second issue was whether "'forcible compulsion' contemplates a particular level of physical force." *Id*. at 216.

As to the first issue, the defendant argued that the forcible compulsion must "result in" the sexual contact, while the state argued that the elements need not be related. *Id*. at 217. Agreeing with the defense, the court determined that the offense necessitates a causal relationship between the forcible compulsion and the sexual contact. *Id*. The court explained its interpretation of the statute:

> "That interpretation also finds support in the distinction between the nonconsensual 'sexual contact' that is punishable as third-degree sexual abuse and nonconsensual sexual contact that is the result of 'physical force,' and, therefore, is punishable as first-degree sexual abuse. The elevation of the nonconsensual sexual contact from a misdemeanor to a felony makes sense only if there is a causal connection between the additional element of 'forcible compulsion' and the submission to or engagement in the sexual contact (or, stated differently, if the submission or engagement was 'compelled by' or resulted from 'physical force')."

*Id*. at 218. The court illustrated what it meant by conduct that is *unrelated* to the sexual contact charged. The court continued:

> "Thus, if a defendant compelled a victim by physical force to sit in a chair, but that conduct was unrelated to any (nonconsensual) sexual contact to which the defendant subjected the victim, the defendant would be guilty of third, rather than first, degree sexual abuse."

*Id*. The court rejected the state's argument that unrelated force might suffice as that version of "forcible compulsion" that is "physical force" under ORS 163.305(1)(a). *Id*. at 219. In other words, an unrelated act of force is immaterial, but a related act, such as putting a victim in a sexually compromising position, is forcible compulsion.

On the second issue, the defendant argued that a measure of force was required for "forcible compulsion" and that the measure of force should require something like a violent or dominating physical force. *Id*. at 216, 219. The court acknowledged the defendant's point that force should not mean the minimum force that is "inherent in the non-consensual sexual contact (touching of the victim or causing the victim to touch the actor)." *Id*. at 221. To find "forcible compulsion," the court drew a distinction between the minimal contact of the offense itself and some added force or additional act. The court concluded:

> "[W]hen the 'forcible compulsion' element of the latter statute is proved by evidence of physical force, the level of force that is involved must be greater than or qualitatively different from the simple movement and contact that is inherent in the action of touching an intimate part of another. But we do not accept defendant's further leap that 'forcible compulsion' therefore *must* involve a violent, dominating level of force. We have no reason to believe that the legislature viewed physical force in this context as a binary system, offering only a choice between the minimum physical movement and contact inherent in any nonconsensual sexual touching and violent or dominating physical coercion."

*Id*. (emphasis in original) Thus, an act with *some* force in whatever measure, other than that the actual sexual contact itself, satisfies the element of forcible compulsion. The court determined:

> "A defendant's conduct can only constitute first-degree sexual abuse when the defendant uses physical force that is *greater in degree or different in kind* from the simple movement and contact inherent in the act of touching."

*Id*. at 226 (emphasis added). In essence, because the amount of force employed need only be "greater in degree or different in kind" than the offense, forcible compulsion may be found in some related act, other than the contact that comprises the offense itself. *Id*. at 225. No "particular level of physical force" is necessary for forcible compulsion. *Id*. at 216, 221, 225.

The court went on to observe that there were two types of physical force related to sexual contact. One type

involved a defendant touching a victim's intimate parts; another type involved a defendant causing a victim to touch the defendant's intimate parts. *Id*. at 225-26. As to the latter type, the court observed that "there likely is a narrower range of conduct" in which causing the victim to touch the defendant would *not* be sufficient to have "compelled" the victim to engage in sexual contact by forcible compulsion. *Id*. at 226. Plainly stated, forcing a victim to make sexual contact *is* likely to be forcible compulsion. *Id*.

Finally, the court addressed the "compulsion" aspect of forcible compulsion. The court added that the issue of force sufficient to "compel" conduct may involve consideration of circumstances known to the defendant such as the victim's age, differences in age, size, strength, the relationship of the parties, and "similar facts." *Id*. Presumably, the relationship of the parties or "similar facts" means consideration of trust, exploitation, or lowering defenses that relate to the amount of physical force necessary to be compelling. *See id*. at 228 (reviewing the defendant's relationship with family as to force sufficient to cause youth to engage in sexual contact); *see also State v. O'Hara*, 251 Or App 244, 250-51, 283 P3d 396 (2012), *rev den*, 353 Or 209 (2013) (defendant—with an uncle-like role in family—employed forcible compulsion when he persuaded 14-year old victim to raise her arm to help remove her shirt because she did not know what to do; he pushed her onto bed, held her arm, and raped her).

The court's application of those standards is illustrative. The first of the two acts becomes a parallel to the case at hand. The court had "little trouble" concluding that the physical force used to cause the victim's hand to touch defendant's penis was different in degree or kind from the simple movement or contact in the act of touching his penis. *Marshall*, 350 Or at 227-28. Further, the age difference between the defendant and victim, as well as the friendly, family-circumstances, related to the physical force used and the court's acknowledgement of forcible compulsion. *Id*. at 228. Together, that evidence sufficed to support that charge. *Id*. By contrast, the court concluded that, as to the other charged act, there was no evidence of physical force, other

than the touching of the victim's buttocks itself. No evidence sufficed to support the latter charge. *Id*. at 228-29.

Recently, this court followed the *Marshall* standards in *State v. Nygaard*, 303 Or App 793, 466 P3d 692, *rev den*, 367 Or 115 (2020). The defendant was convicted of crimes that included first-degree sexual penetration and attempted first-degree rape. *Id*. at 795. Both crimes required "forcible compulsion." *Id*. The victim used a wheelchair and had no ability to move her legs. *Id*. One night, the defendant entered the victim's bedroom and refused her demand that he leave. *Id*. at 795-96. The defendant got onto her bed and after other conduct, pulled down her diaper, grabbed her breast, moved her legs, and inserted a finger into her vagina. *Id*. at 796. At trial, the defendant moved for acquittal arguing that there was no evidence that he had used any physical force beyond the touching that occurred. *Id*.

On appeal, the defendant repeated the argument that his act of moving the victim's legs was inherent in the conduct because somebody would have to move her legs to engage in vaginal sex even if she consented to the conduct. *Id*. at 797-98. This court determined, however, that the force was not inherent in that conduct. *Id*. at 798 (agreeing with state). This court recalled *Marshall*, stating, "[T]here must be a causal connection between the 'sexual contact' and 'forcible compulsion' elements," but "the force need not be violent or dominating." *Id*. (quoting *Marshall*, 350 Or at 227)). We did not treat the positioning movement of the victim's legs as an inherent part of the charged offenses. Instead, we stated:

> "Here, defendant engaged in criminal sexual contact when he penetrated the victim's vagina and when he attempted to rape her. Defendant's act of forcibly moving the victim's legs to make that sexual contact possible might have been a necessary predicate to the contact, given the circumstances, but it was not inherent 'in the action of touching an intimate part of another'—here, the victim's vagina[.]"

*Id*. at 799. This court concluded that, like the defendant in *Marshall* who moved the victim's hand, the defendant "manipulated the victim's legs so he could contact her vagina." *Id*. at 800. What mattered was that defendant used

physical force to move her legs. *Id*. This court held that the trial court did not err in denying the defendant's motions on the two charges. *Id*.

In this case, as a preliminary matter, this court could consider the circumstances that relate to forcible compulsion—those involving the "relationship between the victim and the defendant; and *similar facts*." *Marshall* 350 Or at 226 (emphasis added). Defendant was 11 or 12 years older, six inches taller, and 20 to 30 pounds heavier than K. Although they were strangers, were not members of a family, and had no relationship of trust, K could be found to have been young and vulnerable. Defendant initiated contact with a minor who was unaccompanied. K was an adolescent who found defendant attractive. The two flirted. Whether those circumstances influenced K to follow defendant so as to reduce the physical force necessary to force him into a compromising position, I need not and do not consider, because the predicate act in the bathroom alone sufficed to provide evidence of a causally related act "greater in degree or different in kind" from the "contact inherent" in the offense itself. *See Marshall*, 350 Or at 226 (forcible compulsion).

Defendant invited K to follow defendant into the men's restroom. Once there, defendant closed the stall door, fastened the hasp, and stood blocking the stall door. Even then, K did not know what to expect. Because K testified that he thought defendant was female and that he was interested in kissing defendant, a jury could reasonably infer that K was standing in a normal posture, not planning to move voluntarily into a position in which to engage in oral sodomy with a standing person. When the prosecutor asked K to describe to the jury "exactly" what happened, K testified that defendant put a hand on his shoulder and *pushed* him onto the ground on his knees. K did not describe the gesture of a friendly hand on his shoulder, waiting for him to move voluntarily. Instead, K testified that defendant "pushed me down from my shoulder and *put me* on my knees." (Emphasis added.) K specified, "All the way to the ground onto my knees." K testified that he was not a willing participant when "pushed down." When defense counsel asked what defendant did while "holding" K down, K answered

that defendant dropped defendant's sweatpants, revealing an erection. K's mouth was "shut," but defendant "put" defendant's penis in K's mouth.

K's testimony about being "pushed" into a position in which defendant could engage in oral sodomy is direct evidence of physical force. Jurors are often instructed that there are two types of evidence, and "[o]ne is direct evidence—such as the testimony of an eyewitness." UCrJI 1025; *see State v. Allen*, 312 Or App 584, 608, 494 P3d 939 (2021) (determining UCrJI 1025 applicable to facts). Because it was eyewitness testimony, K's testimony was direct evidence. *See, e.g., State v. Walsh*, 288 Or App 331, 338-39, 406 P3d 152 (2017), *rev den*, 364 Or 680 (2019) (eyewitness identification is direct evidence); *State v. Inman*, 275 Or App 920, 933-34, 366 P3d 721 (2015), *rev den*, 359 Or 525 (2016) (the victim's testimony was not the sole direct evidence); *State v. Draves*, 18 Or App 248, 254, 524 P2d 1225, *rev den* (1974) (eyewitnesses' testimony was direct evidence). K's testimony about being bodily pushed onto his knees was not a matter of inference or speculation about physical force.

The jury could find that K's testimony was an exact description of an event that he experienced when receiving a "push" to the ground on his knees. As a verb in common English usage, to "push" is understood to mean "to *exert physical force* upon so as to cause or tend to cause motion away from the force." *Webster's Third New Int'l Dictionary* 1848 (2002) (emphasis added). Its synonyms are "shove, thrust, and propel." *Id.* K's testimony described how much force was exerted; it was an exertion of physical force, in this case, sufficient to move his body and "put him" on his knees. K's testimony did not describe a friendly hand placed on his shoulder coaxing him to kneel. When asked to describe "exactly" what happened, K testified he was "pushed."

Within the terms of *Marshall*, that evidence of physical force is "greater in degree or different in kind" from "the act of touching" that is sodomy or sexual abuse itself. *See Marshall*, 350 Or at 226 (employing terms). The push appears as or approximates the forcible compulsion of the second sort in *Marshall*—force used to move a victim into

sexual contact with a defendant's genitals. *Id*. As such, it is the sort of force that *Marshall* indicates is unlikely to ever be found *not* to be forcible compulsion. *Id*.

Defendant's act of pushing K into position is like the defendant's act in *Nygaard* of moving apart that victim's paralyzed legs in order to accomplish sexual penetration. None of those acts involve more physical force than was necessary to move a victim's arm and hand or a victim's legs. Those cases did not impose on the state a burden to offer evidence of *how hard* a defendant pushed a hand into position or a leg out of the way. That is because *Marshall* rejected the idea that violence or domineering force was necessary. That is to say, there is no "particular level of physical force" necessary—other than force "that is greater in degree or different in kind" than the sexual act itself. *Marshall*, 350 Or at 216, 226.

## CONCLUSION

In this case, there was direct evidence from which a jury could find that defendant bodily forced K to his knees before engaging in sodomy and sexual abuse. For that reason, I conclude that the trial court did not err in denying defendant's motion for judgment of acquittal on the sodomy and sexual abuse charges.

Tookey, J., Shorr, J., Powers., and DeHoog, J. pro tempore, join in this concurrence.

**MOONEY, J.,** concurring.

A jury convicted defendant of various sex crimes committed in a bathroom stall at the Hood River Public Library. The victim, K, was a 16-year-old boy, who was interested in sexual contact with defendant when he thought that defendant was a cisgender woman. Defendant is a transgender woman. K first learned that defendant had a penis when defendant, who was positioned between K and the only door out of the handicapped stall, pushed K to the ground and lowered her sweatpants. K changed his mind when he saw the penis, but he froze, and defendant proceeded to assault him.

Like every case we see, this one comes with its own unique set of facts and circumstances. Some of those facts

and circumstances prompt us to think about bias and fairness issues. The dissenting opinion expresses concern that the state improperly relies on "defendant's transgender identity [a]s part of the totality of circumstances that could render a push on a shoulder forcible compulsion." 319 Or App at 115 (James, J., dissenting). I do not understand the state to have made that argument. There are a number of circumstances that might trigger biases and inject unfairness into the proceeding. For example, defendant is transgender and African American. K is a male teenager who reportedly may have had homosexual feelings about a friend at some point. Those personal factors raise the possibility of competing biases. Co-occurring or competing biases, in turn, present the risk of overcorrecting for one bias to the exclusion of others. That risk of overcorrection is due, at least in part, to judgments about the relative importance of those biases—judgments that are also driven by personal biases. I voted to affirm because when the circumstances about gender, gender identity, race, and sexual orientation are set aside, it is clear that the jury's verdict is supported by the evidence of what happened that day in the Hood River library.

The only question this court was asked to answer is whether the trial court erred in denying defendant's motion for judgment of acquittal (MJOA). The trial court may not grant an MJOA if the state's evidence would support a verdict against the defendant. ORS 136.445. Where, as here, the court denied the MJOA, we view the evidence on appeal in the light most favorable to the state, and if it is sufficient to support a verdict against defendant, then our job is to affirm. *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998).

The question is whether defendant compelled K, by physical force, to engage in sexual contact against K's wishes. We are required to consider the circumstances of, and surrounding, the alleged predicate act because "the force that is sufficient to 'compel' one person to submit to or engage in a sexual contact against his or her will may be different from that which is sufficient to compel another person to do so." *State v. Marshall*, 350 Or 208, 226, 253 P3d 1017 (2011). Judge DeVore's opinion considers the

circumstances presented by this case but concludes that the "the predicate act"—pushing K into position for oral sex—was itself sufficient evidence of physical force. 319 Or App at 102 (DeVore, S. J., concurring). Judge James's opinion also considers the circumstances but reaches the opposite conclusion—that there was insufficient evidence of physical force. 319 Or App at 113-14 (James, J., dissenting). For me, the push, in isolation, was just a push. But the push, considered in context, supplied evidence of physical force that is sufficient to support, beyond reasonable doubt, that defendant forcibly compelled unwanted sexual contact with K.

The force of the push itself was not described in mathematical terms. And it was not characterized more subtly with words such as "firm" or "light." We know from K's testimony, however, that defendant pushed him "all the way to the ground," and that K described what happened as having been "raped" by defendant. That description supports a reasonable inference that the push was not the gentle, guiding hand of a would-be lover. And even if a force gauge had been present and employed, its measure of compression and tension would not have answered the question of whether the push was legally sufficient evidence of forcible compulsion as between defendant and K without reference to the surrounding circumstances.

Moving then to those surrounding circumstances, there is disagreement about whether there was a power imbalance between defendant and K. But, again, what matters is what the record supports. And, in my view, a rational jury could reasonably have inferred that there was a power imbalance from the 12-year gap between defendant's age and K's age, with the associated differences in intellectual, emotional, and social development; the six-inch difference in their height; and the 20-to-30-pound difference in their weight. And because the presence or absence of a power imbalance may provide insight into the level of force needed to compel sexual contact with K, it matters.

The notion that there was no power imbalance because defendant and K were "stranger[s]" to each other dismisses too summarily the very nature of the brief encounter.

*Id.* at 114 (James, J., dissenting). The idea that defendant did not benefit from a power imbalance because the relationship was not long-term and did not involve a trusted family friend ignores the fact that some short-term relationships are as powerful in the moment as those that develop over time. The assertion that defendant did not "exploit[] a relationship of trust" could most certainly be debated by reasonable jurors. *Id.* (James, J., dissenting). Defendant told K that she was a "new age woman." It may be that defendant intended the phrase "new age woman" to mean transgender woman, but she did not use the word transgender in her conversation with K, who believed that defendant was a cisgender woman. A jury drawing on its collective experience and knowledge might reasonably conclude that there is an expectation of honesty with respect to basic sexual anatomy in any relationship where sexual contact appears imminent. A reasonable jury might conclude that defendant exploited K's trust, in a way that had some bearing on the ease with which defendant was able to lead K out of the public section of the library, away from people, past the security camera and into the bathroom stall which, in turn, impacted how much force defendant would then need to employ to carry out the assault.

It does not further the discussion about force to say that K was not required to "say no" but to then conclude that there was no force because "the absence of communication" from K to defendant amounts to the absence of "objectively observable facts or circumstance[s]," and, thus, a failure of proof. *Id.* at 115 (James, J., dissenting). Defendant pushed K to his knees, revealing an erect penis, and in that moment, K froze, as victims of sexual assault sometimes do. It is difficult to imagine that defendant did not pick up on that reaction. A jury might reasonably have inferred that K froze in response to the rapidly unfolding assault and, further, that his reaction was evidence of both the measure of the force used and the sufficiency of that force to compel sexual contact. I am not aware of any legal authority that supports the use of an assault victim's inability to speak or resist—because he or she reacted to the assault by freezing—as evidence that force was not used to carry out the assault.

The amount of force necessary to overcome a sexual assault victim's will is "highly context dependent." *State v. Beckner*, 303 Or App 744, 752, 466 P3d 1000, *rev den*, 366 Or 826 (2020). We called *Beckner* "a difficult case," and we reversed the conviction there for first degree sexual abuse because we concluded that "the evidence was insufficient to establish forcible compulsion by physical force based on defendant's grabbing of the victim's hips." *Id.* at 753. But this is not *Beckner*. This case is complicated, but that is because the evidence might have persuaded rational jurors to reach different conclusions. The jury concluded that the state proved that defendant committed first-degree sodomy and first-degree sexual abuse beyond reasonable doubt. Because the evidence supports that conclusion, it is our job to affirm—even if we might have reached a different conclusion.

Defendant's status as a transgender woman was brought to the jury's attention by defendant's lawyer in opening statement. It was mentioned a number of times at trial and on appeal. But defendant's transgender status is no more relevant to the question before us than the race, gender, or sexual orientation of defendant or of K. *It frankly does not matter whether the penis that was presented to K as he was pushed to the ground belonged to a transgender woman or to a cisgender man.* What matters is that K froze when defendant pushed him to the ground and revealed a penis. And K's reaction was a factor for the jury to consider in assessing the amount of force defendant needed to employ at that point. Perhaps this would be an easier case if the state had called a qualified expert to testify about the neurodynamics of freezing in response to sexual assault, but it didn't, and I do not think it was required to do so.

The jury concluded that the force defendant used when she pushed K to his knees—while standing over him as she positioned herself between K and the only way out of that bathroom stall—was enough force to cause K to engage in sexual contact against his will, and the evidence was sufficient to support that. That is why I voted to affirm.

DeVore, J. joins in this concurrence.

**JAMES, J.,** dissenting.

In this case, we are unable to coalesce around a rationale for disposition; the ruling of the trial court is left intact, and this case is affirmed by an equally divided court. I would reverse the decision of the trial court for the following reasons.

The charges in this case were brought after the victim, K, gave his mother a note saying that he had been "raped by a transgender" woman on the previous day. K was underage—three days from his seventeenth birthday. Defendant was a 28-year-old woman. Defendant and K met at a library and, by all accounts, the two began flirting. After considerable time flirting, K followed defendant from a library study room to the men's restroom and into a bathroom stall. K did not feel coerced to follow defendant, and defendant did not do anything to physically make K follow her. K did not know exactly what was going to happen in the restroom, but he testified that he entered the bathroom because he "desire[d] to have sexual contact" with defendant.

Defendant shut the stall door behind K, which involved a bathroom stall latch, but no lock. While standing in front of K with her back to the stall door, defendant placed one hand on K's shoulder and pushed K to his knees. There is no testimony about the strength of that "push." As K reached his knees, defendant pulled down her sweatpants exposing her penis.

Now on his knees, K no longer desired to have sexual contact with defendant, but did not communicate that fact. His mouth was "shut," he "didn't know what to do," and he "couldn't bring [him]self to do anything." No threats were made; no words were spoken. K's mouth "opened," and defendant proceeded to orally sodomize K.

Nonconsensual sexual contact is a crime. ORS 163.415. Oregonians under 18 years of age cannot consent to sexual contact, as a matter of law. Accordingly, by virtue of the fact that the victim in this case was under 18, there is no dispute that a crime occurred. The question is the *degree* of the crime as contemplated by the legislature.

Under Oregon law, a wide variety of sexual offenses are elevated in their severity when a defendant compels submission to the nonconsensual sexual act through application of either (1) "[p]hysical force," or (2) "[a] threat, express or implied, that places a person in fear of immediate or future death or physical injury to self or another person, or in fear that the person or another person will immediately or in the future be kidnapped." ORS 163.305(1). What is key is that just because sexual conduct is nonconsensual does not mean that it has occurred by "forcible compulsion." Rather, forcible compulsion represents "a legislative choice to impose a greater punishment when a defendant goes beyond subjecting the victim to nonconsensual sexual intercourse or sexual contact." *State v. Nelson*, 241 Or App 681, 688, 251 P3d 240 (2011), *rev dismissed as improvidently granted*, 354 Or 62, 308 P3d 206 (2012).

Forcible compulsion by physical force occurs when a person uses "physical force" to "compel" someone to "submit to or engage in" sexual contact. ORS 163.305(1)(a); *see State v. Marshall*, 350 Or 208, 217-18, 253 P3d 1017 (2011) (concluding that, although ORS 163.427 does not specify what the victim is being forcibly "compelled" to do, the "only possible" meaning in context is that the victim is being compelled by force to "submit to or engage in" sexual contact). In *Marshall*, the Oregon Supreme Court made clear that the amount of force need not rise to the level of violence but recognized that some quantum of force—in a Newtonian sense—is present in every human physical encounter. 350 Or at 227. Accordingly, the court clarified that when the state seeks to allege a more serious nonconsensual sexual crime, it bears the burden of proving the presence of force beyond that which is always present, a force "greater than or qualitatively different from the simple movement and contact that is inherent in the action of touching an intimate part of another." *Id*. at 221.

Under *Marshall*, when considering compulsion by physical force, a court looks to two separate elements: (1) the amount and nature of the force, and (2) the causal relationship between the force and the submission to sexual contact. When considering the amount or nature of the force, "the

state must prove that the person used enough force to over-come the victim's will, *i.e.*, the victim's desire not to engage in the sexual contact." *State v. Beckner*, 303 Or App 744, 751-52, 466 P3d 1000, *rev den*, 366 Or 826 (2020) (citing *Marshall*, 350 Or at 225). As we indicated in *Beckner*, the amount of force "is ordinarily a question of 'degree' and highly context dependent." *Id*. Thus, relative ages, differences in size and strength between the victim and the defendant, and the rela-tionship between the victim and the defendant all may be contextual factors in evaluating whether the amount of force was "sufficient to 'compel' [the victim] to submit to or engage in a sexual contact against his or her will." *Marshall*, 350 Or at 226; *State v. O'Hara*, 251 Or App 244, 250-51, 283 P3d 396 (2012), *abrogated on other grounds by State v. Vanornum*, 354 Or 614, 317 P3d 889 (2013) (holding that there was sufficient evidence of forcible compulsion where the defendant, a physi-cally large man in his mid-40s, used his body weight to push the teenaged victim down onto a bed, and then held her arms above her head while having intercourse with her).

The issue of causation, however, is less context driven. It is insufficient that the context of the encounter, or the totality of the circumstances, include force. Rather, the state must establish a direct causal link between the specific act of force and the submission to the sexual contact. As we explained in *Beckner*:

> "In *Marshall*, the state argued against a causation requirement, asserting 'that first-degree sexual abuse can be proved by showing an act of physical compulsion that was part of the circumstances surrounding the particular sexual contact at issue, without regard to whether the act of compulsion had any causal relationship to the sexual contact.' [350 Or at 216]. The Supreme Court disagreed, expressly concluding that ORS 163.427 requires a causal relationship between the defendant's use of physical force and the victim's submission to or engagement in the sexual contact. It is not enough that 'the sexual contact be accom-panied by some degree of forcible compulsion,' \*\*\* or that the 'totality of the circumstances' included some act of forc-ible compulsion. [350 Or at 214-15] \*\*\* The use of physical force must cause the victim to submit to or engage in the sexual contact."

303 Or App at 752-53.

It is that distinction—the distinction between force that *causes* submission to the sexual contact, versus forces that merely *accompanies* the sexual contact—that is the axis upon which this case turns. Here, as explained by the prosecutor to the jury, the only acts that the state alleged constituted force were "pushing his shoulders down and blocking the stall."

In its effort to establish that either of those two acts constitute force for purposes of the statute, the state is allowed to draw on reasonable inferences. *See Delgado v. Souders*, 334 Or 122, 135, 46 P3d 729 (2002); *State v. Beason*, 170 Or App 414, 425, 12 P3d 560 (2000), *rev den*, 331 Or 692 (2001). But proper inferences are distinct from speculation. *State v. Bivins*, 191 Or App 460, 467-68, 83 P3d 379 (2004). An inferred fact must be one that the jury is convinced follows beyond a reasonable doubt from the underlying facts. *State v. Lopez-Medina*, 143 Or App 195, 200, 923 P2d 1240 (1996). As we have noted, the line between permissible inference and speculation is drawn, ultimately, "'by the laws of logic.'" *Bivens*, 191 Or App at 467 (quoting *Tose v. First Pennsylvania Bank, N.A.*, 648 F2d 879, 895 (3d Cir), *cert den*, 454 US 893 (1981)). When logic counsels that the inference requires "too great an inferential leap," or depends on the "stacking of inferences" we have strayed into impermissible speculation. *See, e.g., LopezMedina*, 143 Or App at 201; *State v. Piazza*, 170 Or App 628, 632, 13 P3d 567 (2000) ("[T]he stacking of inferences that the state urges is simply too speculative."); *Wood v. Baldwin*, 158 Or App 98, 103, 972 P2d 1221, *rev den*, 329 Or 61 (1999) (similar conclusion). Here, the state failed to establish, either by evidence or nonspeculative reasonable inference, that either of those acts caused the nonconsensual sexual contact, rather than merely accompanied it.

First, the state's characterization of defendant as "blocking" the door is only that—characterization. This encounter occurred in a bathroom stall, a small space where any positioning of two people was going to involve some relationship to the stall door. As K testified:

"[DEFENSE COUNSEL]:   So she's pushing you down with her right hand, and pulling her pants down with

her left hand, and at the same time blocking your door?

"[K]:   She was standing in front of the door."

There is no testimony that defendant held the door shut, barred the door, or prevented K from reaching the door. There is only testimony that, in a confined, unlocked, bathroom stall where both went willingly for the purpose of sexual contact, defendant was the one "standing in front of" the door. If "standing" is force at all, it is merely force accompanying the sexual contact, not causing it.

As to the push on the shoulders, the description of the act offered by the state in testimony—as a "push"—is neutral. As K testified:

"[K]:   [Defendant] pushed me down on the shoulders, pushed me onto the ground on my knees.

"[PROSECUTOR]:   Onto your knees?

"[K]:   Yes.

"[PROSECUTOR]:   And the defendant was standing?

"[K]:   Yeah.

"[PROSECUTOR]:   What—what did you think at that point?

"[K]:   Um—

"[PROSECUTOR]:   Was the defendant clothed or unclothed?

"[K]:   No pants on."

There was no testimony about the force, or power, of the "push" which, by all accounts, occurred either before, or at the same time that defendant's penis was exposed. Was it gentle, or a shove? Was it a hand on a shoulder to coax movement, or a hand on a shoulder demanding movement? No testimony was offered to clarify; there is nothing in this record to answer those questions or allow the factfinder to draw a reasonable inference about the nature of the "push." Inference cannot be made from a vacuum; in such instance, there is only speculation. Accordingly, the description of the act as a push, on its own, is insufficient to assess whether

the act was "greater than or qualitatively different" from the actions inherent in the sexual act and equally insufficient to support a nonspeculative inference that the push caused K to submit. *Marshall*, 350 Or at 221.

The relative characteristics of defendant and K likewise offer little. Certainly, there were differences in age, height, and weight—K was five foot two to five foot three inches tall, and defendant was five foot eight inches tall. K weighed 120-130 pounds, and defendant weighed 150 pounds. But the differences here are not of the nature we considered in *State v O'Hara*, which involved "a man in his forties [and] a 14-year-old child. He weighed about twice as much as she did." 251 Or App at 250-51. Defendant, though older, was a stranger to K and does not seem to have been in charge of the library or to have otherwise exercised control over K or the premises—which were publicly open at the time. There is no testimony that defendant benefited from an imbalanced power dynamic or exploited a relationship of trust that might give rise to any reasonable inferences about the nature of the push, or K's vulnerability to it. Again, distinct from *O'Hara* where we noted that the defendant "occupied a position of trust in the victim's family. Although not a biological relative of the victim, she regarded him as an 'uncle.'" *Id.* at 251.

The state did offer's K's testimony that, at the time of the push, he was "no longer a willing participant" in the sexual encounter. Again, there is no dispute that this encounter was nonconsensual and unlawful. But force is distinct from consent. K's testimony about his unwillingness does not answer the critical causal question. The issue is not whether K was unwilling; the issue is whether defendant's act of force, the push, was the act that *overcame* K's will. *Beckner*, 303 Or App at 751-52. The legislature did not elevate nonconsensual sexual contact compelled by mental or emotional manipulation or circumstance. It must be defendant's physical act that "cause[s] the victim to submit." *Id.* at 753 (citing *Marshall*, 350 Or at 218). Defendant's testimony that, at the time of the push, he was unwilling, does not offer a nonspeculative connection that it was the push, and not something else, that overcame that unwillingness.

Finally, the state advances an argument that, in part, appears to rely on K's subjective knowledge, or lack of knowledge, about defendant. It is undisputed on this record that K willingly entered the bathroom stall with defendant, anticipating a sexual encounter. But, as the state argues, "The trier of fact may consider circumstances known to the defendant [such as] *** K was attracted to defendant *** [and] K believed defendant was [anatomically] female."

The argument is unsettling for two reasons. First, that argument seems to imply that a defendant's transgender identity is part of the totality of circumstances that could render a push on a shoulder forcible compulsion. By their nature, facts that are part of a totality analysis are facts that, if removed, might alter the outcome. Accordingly, that same argument would carry, necessarily, the negative proposition that the same act—a push on a shoulder—might not be forcible compulsion for a cisgendered individual. That dichotomy is unacceptable.

Second, the state's argument improperly focuses on the subjective perceptions of K. It is undisputed on this record that K never communicated to defendant that his initial desire to engage in a sexual encounter had ended, neither at the point of defendant's hand upon his shoulder, nor even upon seeing defendant's penis. To be clear, K was not required to resist, to object, or to say "no." That absence of communication is noteworthy only to clarify that the state's argument in this regard is asking us to draw inferences from subjective perceptions, not objectively observable facts or circumstance, and that is further complicated by the uncontested fact that the encounter began willingly, but transformed somewhere along the timeline.

The state's argument is in too great a tension with the criminal statutory scheme at issue—specifically the *mens rea* needed to prove the element of forcible compulsion. The state appears to argue that K was only attracted to defendant based on his subjective belief as to defendant's anatomy. However, while that fact may be gleaned from K's trial testimony, there is absolutely no evidence that K communicated anything similar to defendant at the time of the actual encounter. It is the time of the encounter, not the time

of trial, that controls. Accordingly, that argument appears to rely on the unspoken, uncommunicated, subjective perception of K with regard to his initial attraction to defendant. More importantly, it appears to rely on an unspoken, uncommunicated, subjective perception of K's response to seeing defendant's penis. And to the extent the state's argument grounds itself in that unspoken, uncommunicated, subjective perception, it is in tension with the state's need to prove, under Oregon law, the attendant mental state. As we explained in *Nelson*,

> "the 'subjected to forcible compulsion' element of first-degree rape and first-degree sexual abuse 'necessarily requires a culpable mental state' because it directly 'concerns the substance or quality of the crime[s]—the harm or evil sought to be prevented.' *** Accordingly, a culpable mental state applies to the forcible compulsion element of those crimes, and the state was required to prove beyond a reasonable doubt that defendant acted with the requisite mental state with respect to that element."

241 Or App at 688.

Because the state is obligated to prove an accompanying mental state—for example, as was pled here, that defendant knew that the nonconsensual sexual contact was being compelled by force—it follows that what constitutes force must, therefore, be objectively *knowable*. The *mens rea* attached to the forcible compulsion element of the crime is critical context that compels the conclusion that any statutory interpretation of "force" that would transform an unremarkable action into force based on the subjective, uncommunicated, and unknowable perceptions of one of the persons involved, is incorrect. Rather, the statutory context of the attendant *mens rea* compels the conclusion that the act envisioned by the legislature must be objectively recognizable as force distinct from the sexual contact.

That conclusion does not require that a victim express nonconsent, or say "no." The objectively recognizable nature of the act can be gleaned from circumstance, but that is lacking here. On this record, the state offered no evidence from which it could be inferred that the hand on the shoulder was the cause of K's submission. Our task is to look for

what evidence, and nonspeculative reasonable inferences that flow from that evidence, would establish that the force that was exerted could be objectively recognizable as causing submission to the sexual contact, and that it, in fact, caused that submission. Absent any such evidence, the state cannot be said to have carried its burden to establish that defendant's hand on K's shoulder was qualitatively different "from the simple movement and contact that is inherent in the action of touching an intimate part of another." *Marshall*, 350 Or at 227. Here, the state failed to carry its burden that the hand on the shoulder caused the sexual contact and did not merely accompany it. Defendant's conduct was a crime, but it was not a crime elevated in seriousness by proof of forcible compulsion. Accordingly, I would reverse the ruling of the trial court.

I respectfully dissent.

Ortega, Egan, Aoyagi, and Kamins, JJ., join in this dissent.

**LAGESEN, C. J.,** dissenting.

I would conclude that the evidence is insufficient to support a finding that that the victim was "subjected to forcible compulsion" by defendant within the meaning of ORS 163.405(1)(a) and ORS 163.427(1)(a)(B), and so would reverse defendant's convictions on Counts 1 and 2.

As pertinent to this case, a victim of a sex offense is "subjected to forcible compulsion" for purposes of those statutes if the victim is "compel[led] *** by physical force" to engage in sexual conduct. ORS 163.305(1). To qualify under the statutes, the force at issue must have two properties. First, the force "must be sufficient to 'compel' the victim, against the victim's will, to submit to or engage in the sexual contact, but it need not rise to the level of violence." *State v. Marshall*, 350 Or 208, 225, 253 P3d 1017 (2011). Second, not only must the force be sufficient to compel the victim to engage in sexual contact, it also must, in fact, result in the sexual contact. *Id.* at 219.

In this case, the only physical force identified by the state is the one-handed push on the victim's shoulder

that preceded defendant's revelation of male genitalia. The record is devoid of detail about the character and degree of force, making it speculative to infer that the push itself was force sufficient to compel the victim to submit to the sexual contact with defendant. At most, it is inferable that the push is what caused the victim to change his mind about what, until that point, had been a factually consensual, but not legally consensual, interaction. That does not allow for a reasonable inference that the push itself was sufficient to compel the victim to engage in sexual contact against his will, or that the push itself—rather than defendant's disclosure of male genitalia and the overwhelming effect that disclosure had on the victim—resulted in the victim submitting to sexual contact.[1]

It is important to recognize what this conclusion does not mean. It does not mean that the victim consented to sexual contact with defendant. Far from it. That sex is not compelled by physical force does not mean that sex is consensual. Here, separate and apart from the fact that the victim's age rendered him legally incapable of consent, the evidence would support a finding that the victim, regardless of age, did not factually consent to the contact and did not have a reasonable opportunity to express his lack of consent under the circumstances. It is also inferable that defendant was aware of the risk that the victim had not consented to sexual contact with defendant's penis, yet disregarded that risk in proceeding without ascertaining whether the victim consented to that contact.

A reading of the current Oregon statutes reveals that they supply little guidance when it comes to a case like this one, in which an interaction that was factually consensual at its outset turns nonconsensual. In contrast, a section

---

[1] Although defendant does not raise the issue, the jury instructions that the trial court delivered on first-degree sodomy and first-degree sexual abuse would have permitted the jury to find defendant guilty on those counts without finding that any physical force used by defendant in fact resulted in the sexual contact, as required under *Marshall*. The instructions echoed the statutory wording itself, which does not on its face explain that the required force must in fact result in the sexual contact. *See Marshall*, 350 Or at 217-19 (discussing the point). This creates the possibility that the jury convicted defendant based on a finding that defendant both used physical force (the push) and subjected the victim to sexual contact, without finding a causal nexus between the force and the contact.

of the recently revised Model Penal Code provisions address-ing sexual assault and related offenses addresses the situ-ation at hand by specifically accounting for how something unexpected in the course of a sexual encounter—such as the unexpected revelation of male genitalia—can bear on con-sent and, more critically, the ability to communicate lack of consent.

Defining the crime of "Sexual Assault in the Absence of Consent," section 213.6 provides:

"(1)   An actor is guilty of Sexual Assault in the Absence of Consent when:

"(a)   the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

"(b)   the other person does not consent to that act; and

"(c)   the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) are present.

"(2)   *Grading.* Sexual Assault in the Absence of Consent is a felony of the fifth degree [*three-year maximum*], except that it is a felony of the fourth degree [*five-year maximum*] when:

"(a)   the other person has, by words or actions, expressly communicated unwillingness to submit to or perform the act, *or the act is so sudden or unexpected that the other per-son has no adequate opportunity to express unwillingness before the act occurs*; and

"(b)   the actor is aware of, yet recklessly disregards, the risk that a circumstance described in paragraph (a) existed at the time of the act of sexual penetration or oral sex.

"(3)   If applicable, the actor may raise an affirmative defense of Explicit Prior Permission under Section 213.10."

*Model Penal Code: Sexual Assault and Related Offenses* § 213.6 (Am L Inst, Tentative Draft No. 5, 2021) (*MPC*) (emphases added).

A provision like this one could supply greater clar-ity to Oregon law on sexual offenses. That, in turn, could both help people to conform their conduct to the law more easily, and help ensure that sexual conduct resulting in

criminal charges is evaluated by judges and juries under clear and objective standards appearing on the face of the statutes.[2] Should the legislature wish to consider the point, the recently revised provisions of the Model Penal Code offer a place to start.

Ortega and Kamins, JJ., join in this dissent.

---

[2] In that regard, it also is worth noting that the revised provisions of the Model Penal Code provide a definition of "physical force" that would make it much easier for people to know what constitutes "physical force" in the context of the laws governing sex offenses than does current Oregon law, which defines the term largely through caselaw. Defining "[p]hysical force or restraint," section 213.0(2)(f) provides:

"(i) 'Physical force or restraint' means a physical act or physical restraint that inflicts more than negligible physical harm, pain, or discomfort or that significantly restricts a person's ability to move freely. More than negligible physical harm includes but is not limited to a burn, black eye, or bloody nose, and more than negligible pain or discomfort includes but is not limited to the pain or discomfort resulting from a kick, punch, or slap on the face."

*MPC* § 213.0(2)(f)(i).